IN THE MATTER OF THE CONTEST OF THE ALLEGED ELECTION OF JOSEPH L. DONAHAY, TO THE OFFICE OF SURROGATE OF MONMOUTH COUNTY, STATE OF NEW JERSEY.

Decided August 2, 1943.

For the contestant, *J. Victor Carton, John M. Pillsbury* and *Charles Frankel.*

For the incumbent, *Ward Kremer* and *Joseph F. Mattice.*

KINKEAD, C. C. J. At the general election held in Monmouth County, New Jersey, on November 3d, 1942, Joseph L. Donahay was declared elected as surrogate of Monmouth

County by a margin of 84 votes. His opponent, E. Donald Sterner, thereupon proceeded to recount 80 of the 153 election districts in Monmouth County. As a result of the partial recount, Donahay's plurality was reduced to a total of 14 votes.

Sterner then initiated this proceeding in the Circuit Court, contesting Donahay's election in accordance with the provisions of *R. S.* 19:29–2, *et seq.; N. J. S. A.* 19:29–2, *et seq.* In his petition, the contestant alleged that there had been malconduct, fraud or corruption on the part of the members of the district board of the third district of the third ward of the City of Long Branch, and contended that the entire vote cast for the office of surrogate in said district should be rejected and eliminated.

Donahay filed an answer denying the allegations of fraud set forth in the petition. He also filed a counter-claim in which he alleged that there had been gross malconduct, fraud and corruption upon the part of the members of the district boards in the first, second, third and fourth election districts of the Borough of Belmar; as a result of which, Donahay sought to have the votes cast for surrogate in those four districts set aside and rejected. The incumbent also alleged that the Monmouth County Board of Elections had made an error in counting, canvassing and declaring the vote of men in the armed forces of the United States at said election, and that the Board of Elections did not determine, prior to counting and canvassing the said vote, whether the members of the armed forces were registered or not, as required by law.

The same rule and principle of law applies with equal force to the Long Branch and Belmar phases of the instant case. Therefore, these two issues can be considered jointly. In the Long Branch phase, the tally by the district board at the close of the election gave Donahay 294 votes and Sterner 77. In the recount of the Long Branch district, Donahay's total was reduced from 294 to 264, and Sterner's total was increased from 77 votes to 85. The recount therefore uncovered the fact, that Sterner had been defrauded to the extent of 38 votes in the original tally.

In his contest in the Circuit Court, the contestant proved

conclusively that 45 fraudulent votes had been received and counted by the board in the Long Branch district on election day. The contestant also proved that one of the election officers had taken some ballots on two different occasions, and after marking them, deposited them in the ballot box. The election officer so accused, while strenuously denying on the witness stand the charges of ballot box stuffing, frankly admitted that he had been working in the interests of the incumbent on election day, and that he was a Democratic county committeeman.

The contestant further established that the names of persons who had voted in this district had not been entered in the poll book up to 2:30 P. M., and that, thereafter, names were written in the poll book by individuals who were not members of the election board. Several other irregularities were also proven, but the more serious violations have been heretofore set forth. At the close of the Long Branch testimony, the contestant had clearly proven the existence of fraud in the third district.

In the Belmar phase of the contest, the incumbent proved that in the third Belmar district, only one of the four election officers who had served on election day had been lawfully appointed by the Monmouth County Board of Elections; that one of the Democratic election officers who had served without legal authority had been a registered Republican in 1941; that the Republican member of the district board who had served without lawful appointment was an employee and also a tenant of the contestant. It was further established that this board had unlawfully received and counted the votes of 31 unregistered voters, and incumbent contended that the board had permitted one voter to vote who did not live in the district, and had accepted the vote of another person who did not even live in Belmar.

The incumbent contended that the irregular status of the election board in the third district was brought about by a desire on the part of Carl Schroeder, Democratic leader of Belmar, to further Sterner's election, by substituting an election board on election day which would be amenable to the wishes of the Republican party leaders. Donahay contended

that Schroeder was not interested in a Democratic victory on November 3d, 1942; that Schroeder was interested only in furthering Schroeder's own election chances in the spring of 1943, when Schroeder was a candidate on a ticket in Belmar bracketed with Mayor Abbott of Belmar, who is a political ally and supporter of the contestant; that Schroeder conspired with Mayor Abbott and with Sterner to aid Sterner on November 3d, 1942, in return for which Mayor Abbott and Sterner were to aid Schroeder in the Belmar election of May, 1943.

Donahay further proved that in the first, second and fourth Belmar districts, 55 unregistered voters had been permitted to vote, 10 in the first district, 7 in the second, and 38 in the fourth.

The action of the four Belmar district boards in permitting unregistered voters to vote was, of course, illegal, but the proof offered by the incumbent nevertheless failed to substantiate his allegations of fraud as to any of the four districts. Furthermore, I find no merit in the charge that Carl Schroeder conspired with Mayor Abbott and the Belmar Republican leadership to aid Sterner.

The non-compliance with the provisions of the statute in the replacement of the three members of the district board in the third district is censurable and unfortunate. Schroeder was also careless in permitting a 1941 registered Republican to act as a Democratic member of the district board. Despite any dereliction on his part, however, Schroeder made a good impression on the court while on the witness stand. His testimony and that of Edward J. Ascher, vice-president of the Belmar Democratic Club, was quite convincing that while irregularities had taken place in Belmar, there was no reasonable ground to conclude that the Republicans and Democrats there had conspired to assist Sterner at the expense of Donahay. It is appropriate to note at this point that, even if the testimony offered by the incumbent had constituted fraud in any or all of the Belmar districts, that incumbent even, under those circumstances, would not be entitled to have the entire vote cast for surrogate in any fraudulent district set aside and rejected.

In an election contest, the discovery of fraud in an election district does not *ipso facto* justify the rejection of the entire vote cast in that district. Where the result of the fraudulent conduct of the members of an election board can be ascertained and its effect exscinded, and the true will of the electorate determined, this should be done. The rejection of the entire vote of an election district is justifiable and permissible only, when the fraud perpetrated or permitted by a district board, is so extensive or of such a character that the correct and genuine result of the voting in that district cannot be determined with reasonable certainty. *Burkett* v. *Francesconi*, 127 *N. J. L.* 541; 23 *Atl. Rep.* (*2d*) 780.

Applying this rule to the Long Branch phase of the case *sub judice*, it is quite apparent that the entire vote of the third Long Branch district cannot be rejected. The attempt of the district board to increase Donahay's total and to reduce Sterner's total by a fraudulent tallying of the vote at the close of the election has been corrected and properly adjusted by the recount.

The net result of the other malconduct, on the part of the district board, as disclosed by the testimony, was the reception and counting of 45 fraudulent votes. It is not necessary to determine whether these 45 votes had been cast by means of ballot box stuffing on the part of one or more board members, or whether floaters were used. The extent to which fraud was perpetrated in the district is the important factor for the court to determine; the method used in the perpetration, so far as this contest is concerned, is of no consequence.

It was not possible, of course, for the contestant to prove that the 45 fraudulent votes had been cast and counted for Donahay, and because of that fact, the incumbent contended that the contestant's petition must be dismissed because the Long Branch phase came squarely within the rulings of the Supreme Court in *Lehlbach* v. *Haynes*, 54 *N. J. L.* 77; 23 *Atl. Rep.* 422, and *Lippincott* v. *Felton*, 61 *N. J. L.* 291; 39 *Atl. Rep.* 646.

In *Lehlbach* v. *Haynes*, *supra*, 353 illegal ballots had been cast in 27 election districts in an election held in Essex County. Mr. Justice Dixon, speaking for the Supreme Court,

held (at *p.* 80 of 54 *N. J. L.;* at *p.* 423 of 23 *Atl. Rep.*) : "The names of these persons and the districts in which they voted are given. But, there is nothing to indicate for whom they voted. Without this, the court cannot say that these illegal votes were 'sufficient to change the result.' * * * The presumption is with the incumbent, and we cannot assume, without evidence against that presumption, that the illegal ballots were for him rather than his opponents."

In *Lippincott* v. *Felton, supra,* the contestant proved that votes had been cast in the name of 18 registered voters in an election district; that 17 of such registered voters did not vote at all, and that the remaining voter came in, after his name had been voted on, and was permitted to vote. Chief Justice Magie, speaking for the court, held (at *p.* 295 of 61 *N. J. L.;* at *p.* 647 of 39 *Atl. Rep.*) : "It thus appeared that there were 18 illegal ballots received, but the evidence fell short of showing that they were cast by the persons named in the petition, or that they contained the name of respondent for the office for which he and contestant were candidates. The failure of contestant to prove that the illegal votes, which he claimed had been cast for incumbent, were cast by the persons who were named in his petition, in my judgment, is fatal to his contest."

The case *sub judice* must, however, be distinguished from *Lehlbach* v. *Haynes, supra,* and *Lippincott* v. *Felton, supra.* A scrutiny of the facts set forth in each of those cases discloses that no testimony had been adduced in either case from which it might have been inferred with reasonable certainty that the incumbent had benefited by the fraudulent voting. But the evidence throughout the Long Branch phase conclusively demonstrated that any fraud perpetrated in the Long Branch district had been committed for the benefit of Donahay.

In an election contest, where fraudulent or illegal voting has been clearly established, it is the duty of the court, when the court can determine with reasonable certainty the number of the fraudulent or illegal votes cast, and the candidate for whom they have been cast, to strike from said candidate's total the number of either or both types of votes, which the court finds has been included in said candidate's total vote.

Since I can determine with reasonable certainty that Donahay was the beneficiary of the 45 fraudulent votes, I accordingly find and rule that Donahay's total in the third Long Branch district shall be reduced from 264 votes to a total of 219 votes.

In the Belmar phase, it is merely necessary for the court to nullify the effect of the illegal actions of the four district boards there in permitting unregistered voters to cast their ballots, by eliminating from the respective totals of Donahay and Sterner, the number of illegal votes, which the court determines with reasonable certainty from the evidence were cast for the respective candidates.

In the first Belmar district, there were 10 illegal votes cast. Of this total, there were 8 Republican votes, 1 Democratic vote, and 1 vote undetermined. I therefore find and rule that Donahay's total in this district shall be reduced from 150 votes to 149, and that Sterner's total shall be reduced from 295 votes to 287.

In the second Belmar district, 7 illegal votes were cast. Three of these were Republican votes, 2 were Democratic, and 2 were undetermined. Donahay's total in this district is therefore reduced from 147 votes to 145, and Sterner's total is reduced from 256 votes to 253.

In the third Belmar district, 31 illegal votes were cast. Of this total, 26 votes were Republican, and 5 were Democratic votes. Therefore, Donahay's total in this district is reduced from 90 votes to 85, and Sterner's total is reduced from 235 votes to 209.

In the fourth Belmar district, 38 illegal votes were cast. Of this total, there were 28 Republican votes, 9 Democratic votes, and 1 undetermined. Therefore, Donahay's total in this district is reduced from 147 votes to 138, and Sterner's total is reduced from 256 votes to 228.

The sole remaining phase of the instant case which must be considered and determined is the contention of the incumbent, that the vote of the armed forces must be set aside and eliminated, because the Monmouth County Board of Elections failed to ascertain whether those members of the armed forces, who had voted at the election, had been registered.

The statute which conferred on absent members of our military forces the right to vote is chapter 18 of the laws of 1942, *N. J. S. A.* 19:54–25, *et seq.* Paragraph 3 of that act, *N. J. S. A.* 19:54–27, is as follows:

"The purpose of this act is to afford *every legally qualified voter of this State* who is in active service in the military forces of this State or of the United States the opportunity to vote in any primary, general or special election held in this State or in any subdivision thereof, notwithstanding the fact that such person may be absent on said election day from the election district in which he resides, whether such person is within or without this State, or within or without the United States."

Paragraph 4, *N. J. S. A.* 19:54–28, provides substantially that not later than forty days prior to any election, the Adjutant-General of New Jersey shall furnish to the clerks of the various counties of this state the name and post office addresses of every *qualified elector* of this state, in active service in this state or of the United States.

Paragraph 5, *N. J. S. A.* 19:54–29, provides that at least twenty-five days prior to the election, the county clerk shall mail a ballot to each person in active service.

The form of the ballot to be forwarded is set forth in paragraph 6, *N. J. S. A.* 19:54–30. Paragraph 7, *N. J. S. A.* 19:54–31, provides that with each ballot a printed copy of the law or printed directions for voting and transmitting of the ballot shall be forwarded to each of the military forces by the various county clerks.

Paragraph 9, *N. J. S. A.* 19:54–33, provides *inter alia* that, after the ballot has been filled in by the voter, it shall be placed in an inner envelope and sealed. The sealed inner envelope shall then be placed in an outer envelope, and the voter shall then write upon the back of the outer envelope the name of the military organization to which he belongs, and the *home address from which he is entitled to vote,* and also a statement as follows:

"*I certify that I am a duly qualified elector of the State of New Jersey,* and that I reside at ____ in the ____ of ____, in the County of ____, and that I am entitled to

vote at the election held in the        on the        day
of        19 ."

The voter shall sign his name below said certificate, and
the certificate itself shall be witnessed by any commissioned
officer.

Paragraph 11 of the act, *N. J. S. A.* 19:54–35, is as
follows:

"The County Boards of Elections shall promptly, after
receiving any ballot, make such investigation as may be neces-
sary to ascertain whether or not the persons whose names
appear on the outside of the outer envelope are *legally quali-
fied voters actually entitled to vote at such election.*"

The federal statute, 50 *U. S. C. A.*, § 308, has abolished
registration as a voting requisite for our military forces, but
no such abolition is contained in the New Jersey statute. If
this contest involved election to a federal office such as Con-
gress or the United States Senate, then the federal statute
would control. Any contest, however, involving as the present
contest does, election to a county office is governed, of course,
by the provisions of our state law.

A careful consideration of the act leads to the inevitable
conclusion that, by the enactment of this statute, the legis-
lative intent was to provide the means by which the members
of our military forces, who were legally qualified New Jersey
voters, could vote at any election in this state, despite their
absence from their election district at the time of the election.

There can be no doubt that the act requires registration
as a prerequisite to the right to vote in New Jersey even for
the members of our military forces. The terms "legally
qualified voter" and "qualified elector" which are used
repeatedly in the act, clearly indicate the requirement for
registration. The provision in paragraph 11, directing county
boards of election to investigate whether members of the mili-
tary forces were legally qualified voters entitled to vote at
such election, unquestionably required the county boards to
ascertain whether such military voters were legally registered.

A substantial number of the 262 military voters, who cast
ballots at the election, were not registered. The Monmouth
County Board of Elections failed to take any steps in accord-

ance with the provisions of paragraph 11, to ascertain which of the ballots had been cast by "legally qualified voters actually entitled to vote at such election." Instead, without making an investigation of any sort, the County Board proceeded to canvass and tabulate the entire military vote. Thus, there was no opportunity to separate the valid ballots from the invalid, nor was there any way of discovering for which candidate the invalid ballots had been cast.

Within the past year, Judge Walter D. Van Riper of the Essex County Court of Common Pleas made a ruling on the point involved in this phase of the instant case, and in a decision given from the bench, Judge Van Riper stated:

"I cannot help but reach the conclusion that Congress has abolished registration as far as federal offices are concerned and that they have no jurisdiction over state offices or county offices, and the state legislature has failed to abolish registration as far as state and county offices are concerned. Therefore, as to local offices the voter must be registered. As to the federal offices, he does not have to be registered.

"It is my conclusion that where the state act refers to the right of a person to vote who is a legally qualified voter it means a person who has complied with all the requirements of the election law necessary to vote, including registration, in so far as it refers to state or county or municipal offices, but not federal offices."

I am convinced that the Monmouth County Board of Elections erred because the members were under the impression that the election was controlled by the federal statute, and that therefore, there was no necessity to ascertain whether military voters were legally registered or not. But the board's error, while committed in good faith, was nonetheless fatal, and it completely nullified the entire military vote cast at the election.

One hundred and sixty-two of the military votes had been cast for Sterner and 110 had been cast for Donahay. I accordingly rule that Sterner's total vote shall be reduced by 162 votes, and that Donahay's total shall be reduced by 110 votes.

As heretofore stated, Donahay led by 14 votes at the termi-

nation of the recount of 80 election districts. When the Long Branch phase of this contest was concluded, Sterner led by 31 votes. In Belmar, Donahay gained a net total of 48 votes, putting Donahay in the lead by 17 votes. By the nullification of the military vote, Sterner lost a net total of 52 votes. Thus, at the conclusion of all phases of this election contest, Donahay led Sterner by a total of 69 votes.

Therefore, in accordance with the provisions of the statute, I pronounce judgment in favor of the incumbent, Joseph L. Donahay, and I declare the said Joseph L. Donahay to have been elected to the office of surrogate of Monmouth County, New Jersey, at the general election held in said county on November 3d, 1942, by a plurality of 69 votes.