Kenneth LUSE, Omin Kelly, Ella H. Kelly, Rose L. Bolser, Craig A. Anderson, Kimberley Moeller, William S. Hoyt, Hazel M. Hoyt, Helen M. Wick, Mark Hemmingson, Linda Hemmingson, Stanley Tindall, Lois Tindall, Elvin Lippke, Maynard Braband, Roman Starzl, and Lyle R. Stephens, Appellants,

v.

David L. WRAY, Chief Clerk of the Iowa House of Representatives, Dale M. Cochran, Speaker of the Iowa House of Representatives, Norman G. Jesse, Speaker Pro Tempore and Chairman of the Election Contest Committee of the Iowa House of Representatives, Edris L. Owens, Sergeant at Arms of the Iowa House of Representatives, and James W. Spradling, Appellees.

No. 2–58644.

Supreme Court of Iowa.

May 25, 1977.

B. A. Webster, Des Moines, and Herbert S. Selby, Newton, for appellants.

Richard C. Turner, Atty. Gen., and Lee H. Gaudineer, Sp. Asst. Atty. Gen., for appellees.

UHLENHOPP, Justice.

This case essentially involves the validity of an election contest for a seat in the Iowa House of Representatives. It is not itself an election contest or an appeal from a contest, but it attempts, ultimately, to overturn the result of a contest. Nor is it a challenge to the validity of the original election.

Plaintiffs claim that the case involves only a declaratory judgment regarding interpretation and constitutionality of an election statute, but the case would present only an abstract question but for the underlying election contest; moreover, plaintiffs state in their brief that if they win a declaratory judgment they can seek "appropriate relief" on it later. Thus we are satisfied that at bottom the case involves the validity of the contest which was held.

Lyle R. Stephens and James W. Spradling ran in the general election on November 5, 1974, for a seat in the Iowa House of Representatives from Representative District 2 for the term commencing January 1, 1975. That district is in Plymouth and Sioux Counties.

Mr. Stephens received a total of 4613 votes and Mr. Spradling received 4589, or 24 less, according to the canvass of the vote including absentee ballots. Mr. Spradling promptly commenced a contest of the election in the Iowa House of Representatives

on two grounds, one of which is not now involved. The other ground related to absentee voting in Plymouth County. In that county, 135 absentee ballots were cast for this office, 83 for Mr. Stephens and 52 for Mr. Spradling.

The House temporarily seated Mr. Stephens and appointed a committee regarding the contest.

The contest committee heard evidence and on May 12, 1975, presented its majority and minority reports to the House. According to the majority report and the evidence in the present court action, 43 of the 135 absentee ballots in Plymouth County were cast by voters who were patients in hospitals or health care facilities in that county. The county election commissioner mailed those 43 ballots to the patients, notwithstanding § 53.17 of the then Iowa Code requiring the ballots to be delivered to such patients by one member each of the two major political parties, during the three working days preceding the election. The remaining 92 absentee ballots were properly delivered and cast.

The county election commissioner commingled all 135 absentee ballots which had been cast. How the 43 patients or the other 92 absentees voted on the Stephens-Spradling race does not appear. A majority of the contest committee found in substance that the 43 votes cast by the patients were invalid because mailed in violation of § 53.17. The majority also found that since all 135 absentee ballots were commingled, the minimum number of tainted ballots would be the 135 absentee ballots, and that those 135 ballots should not be counted. This reduced Mr. Stephens' vote by 83 to 4530 and reduced Mr. Spradling's vote by 52 to 4537, giving Mr. Spradling a lead of 7. The majority recommended that Mr. Spradling be declared elected. The House subsequently approved the majority report and seated Mr. Spradling.

Thereafter Mr. Stephens and the other plaintiffs commenced this action against Mr. Spradling and the officers of the House, asking that § 53.17 of The Code be declared unconstitutional or unconstitutional as construed by the House; that the action of the House in seating Mr. Spradling be declared illegal and unconstitutional; that the House officers be enjoined from seating Mr. Spradling, from certifying him for pay, and from depriving Mr. Stephens of his seat; and for other equitable relief. Plaintiff Stephens, the candidate who ran in the contested election, is an elector of the district in question. Plaintiff Luse also is an elector of the district; he voted for Mr. Stephens in the election by regular absentee ballot and not as a patient; his was one of the 92 properly-cast absentee ballots which was not counted by the House because of the commingling of those ballots with the 43 absentee ballots found by the House to be invalid.

The trial court held that the House had exclusive power over the election contest and that § 53.17 of the Code is constitutional, and dismissed plaintiffs' petition. Plaintiffs appealed and defendants cross appealed.

The parties argue numerous issues, but we find consideration of a number of those issues unnecessary as not controlling.

I. At the outset defendants challenge the power of the judicial branch to entertain this action. Section 7 of Article III of the Iowa Constitution states regarding the General Assembly:

Each house shall choose its own officers, and judge of the qualification, election, and return of its own members. A contested election shall be determined in such manner as shall be directed by law.

Under that section, the General Assembly enacted chapter 59 of the Code, providing the procedure in the Senate and House respectively for the contest of elections for seats in those bodies. Thus by constitution and statute, the power of the respective legislative bodies over election contests for legislative seats is clearly spelled out, and under the additional constitutional clause on the distribution of powers the courts cannot entertain election contests regarding such seats: "The powers of the government of Iowa shall be divided into three separate

departments—the Legislative, the Executive, and the Judicial: and no person charged with the exercise of the powers properly belonging to one of these departments shall exercise any function appertaining to either of the others, except in cases hereinafter expressly directed or permitted." Iowa Const. Art. III (of the Distribution of Power), § 1.

Does this mean that the courts are powerless to grant relief if a legislative body in exercising its election contest function acts in violation of another constitutional clause? By analogy, the Iowa General Assembly also possesses exclusive constitutional power to legislate, by virtue of § 1 of Article III (Legislative Department), but that does not mean the courts are powerless to declare legislation invalid if it violates another constitutional clause. This latter power of courts goes back to *Marbury v. Madison*, 1 Cranch 137, 2 L.Ed. 60. See 16 Am.Jur.2d Constitutional Law § 101 at 285; 16 C.J.S. Constitutional Law § 92 at 293.

■ Section 1 of Article V of the Iowa Constitution sets forth the judicial power in these general terms:

The Judicial power shall be vested in a Supreme Court, District Courts, and such other Courts, inferior to the Supreme Court, as the General Assembly may, from time to time, establish.

General statements as to what "judicial power" means include the gamut of *the determination of constitutional questions.* It is for the judicial department to determine "whether any department has exceeded its constitutional functions; and to restrain them from exceeding their power and authority." Hence, "it is a matter for the judiciary to pass upon the constitutionality of the official and specific acts of the other departments of government . . . ." 16 C.J.S. Constitutional Law § 144 at 688. See also *Kruidenier v. McCulloch*, 258 Iowa 1121, 142 N.W.2d 355; 16 Am.Jur.2d Constitutional Law § 221 at 464 ("Under the American system of constitutional government, among the most important functions entrusted to the judiciary are the interpreting of constitutions and, as a closely connected power, the determination of whether laws and acts of the legislature are or are not contrary to the provisions of the federal and state constitutions.").

■ The broad power of the courts to determine constitutional questions would appear to include allegedly unconstitutional legislative conduct of election contests. Until recently, however, as with the analogue of legislative reapportionment, courts uniformly held that the judiciary had no power to inquire on any basis into the exercise by a legislative body of its express constitutional power to judge of the election of its members. The decisions are gathered in Annotation, 107 A.L.R. 205. But in the area of legislative reapportionment, despite warnings about the "political thicket," the United States Supreme Court accepted jurisdiction in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. Closer to the present situation, in the companion area of judging of the "qualification" of legislative members—a power also expressly granted to the legislature—the United States Supreme Court more recently entered the field to uphold a federal constitutional guarantee. *Bond v. Floyd*, 385 U.S. 116, 131, 87 S.Ct. 339, 347, 17 L.Ed.2d 235, 245. There, under the guarantee of freedom of speech, the Court held invalid the exclusion of Julian Bond by the Georgia House of Representatives, saying, "We conclude as did the entire court below that this Court has jurisdiction to review the question of whether the action of the Georgia House of Representatives deprived Bond of federal constitutional rights . . . ."

The Court took another step, yet closer to the present one, in *Powell v. McCormack*, 395 U.S. 486, 549, 89 S.Ct. 1944, 1978, 23 L.Ed.2d 491, 532. There the Court, again determining a federal constitutional question, held that the United States House of Representatives was wrong in the application of its express constitutional "expulsion" power to an "exclusion" situation. On the power of courts to act in the area of constitutional grants of power to Congress, the Court said: "Our system of government requires that federal courts on occasion in-

terpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility."

In connection with the *Bond* decision, an editor prepared an Annotation in 17 L.Ed.2d 911, 912. After referring to the prior uniform line of decisions maintaining a hands-off position in this area, the editor stated:

> Now another citadel has been assaulted. Since the decision in *Bond v. Floyd* . . . the power of a state legislature to determine whether an elected representative meets certain qualifications can no longer be said to be exclusive. Plainly, in assuming jurisdiction on grounds that a substantial federally protected right, in this instance free speech, was involved, the Supreme Court has opened the way to reviewing any election controversy in which it is claimed such a right is infringed. Whereas the court could have reinforced the doctrine of separation of powers by invoking either the "political question" doctrine or the "abstention" doctrine, it chose not to. Perhaps in the light of *Baker v. Carr* . . . there was not enough left of the political question doctrine for the Supreme Court to have taken refuge in.

Study of the *Bond* and *Powell* decisions persuades us that the trend is away from the former completely hands-off doctrine when the charge is that a legislative body substantially violated a constitutional guarantee while exercising an express constitutional power. The courts' power to determine a constitutional question applies. We see no reason why that power of courts should extend only to rights under the federal, as distinguished from a state, constitution, or only to the exercise of that power by a federal, as distinguished from a state, court. We thus hold that Iowa courts have power to adjudicate substantial claims of deprivation of federal or Iowa constitutional rights by the houses of the Iowa General Assembly in the exercise of the houses'

election contest powers under § 7 of Article III of the Iowa Constitution.

▮ II. Next defendants assert that plaintiffs do not have "standing" to maintain this action and that the action does not present a "justiciable controversy."

As to standing, we find consideration of only two plaintiffs to be necessary, Mr. Stephens and Mr. Luse. In a voter case, the United States Supreme Court stated the test of standing thus: "Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663, 678.

Mr. Stephens is one of the rival candidates in the underlying election contest. He claims among other things that then § 53.17 of the Iowa Code, upon which the contest decision of the House rests, is unconstitutional as violating equal protection and due process rights of absentee voters who are patients. This is not a mere jus tertii situation, for Mr. Stephens himself was directly hurt in consequence of application of the allegedly unconstitutional statute. See *Iowa Movers & Warehousemen's Ass'n v. Briggs*, 237 N.W.2d 759 (Iowa). We think Mr. Stephens plainly has such sufficient personal stake in the outcome to give him standing. See *Motor Club of Iowa v. Department of Transportation of the State of Iowa*, 251 N.W.2d 510 (Iowa).

Mr. Luse is one of the 92 electors whose valid regular absentee ballots were not counted because intermixed with absentee ballots not delivered in accordance with § 53.17. He too claims that § 53.17 violates equal protection and due process and that the action of the House is therefore founded on an unconstitutional statute. While he is not a candidate, he says that by applying unconstitutional § 53.17 to the patients' absentee ballots and by invalidating the regular absentee ballots as well because of commingling, the House deprived him of his right to vote guaranteed by Amendment 30

to the Iowa Constitution ("Every citizen of the United States of the age of twenty-one years [with the required residence] shall be entitled to vote at all elections which are now or may hereafter be authorized by law. . . ."). Certainly if the plaintiffs in *Baker v. Carr* had standing, Mr. Luse does. See also *Kruidenier v. McCullouch*, 258 Iowa 1121, 142 N.W.2d 355. We hold that he has standing.

■ As to justiciability, had we held that courts are without power to hear actions of this kind, we would not of course have a "justiciable" controversy. In this sense, then, we do have justiciability, for in this action we have held the opposite—that courts do have such power. See *Powell v. McCormack*, 395 U.S. 486, 516, 89 S.Ct. 1944, 1961, 23 L.Ed.2d 491, 514. A live dispute between the parties must also exist to have a justiciable controversy, not merely a moot one. But this litigation does not present only a moot and thus abstract question, if for no other reason than an unresolved salary dispute. *Powell v. McCormack*, supra.

At least two of the plaintiffs, Messrs. Stephens and Luse, have standing, and the case involves a justiciable controversy.

■ III. We proceed then to the merits of the case. The first question relates to interpretation of § 53.17 as it existed in relevant part at the time of the 1974 election and to the effect of deviation by the election commissioner from the requirements of that section. We cannot consider § 53.17 alone, however, for plaintiffs' argument involves both § 53.8 and § 53.17. Section 53.8 provided, as found in 65 G.A. ch. 136, § 237:

Upon receipt of an application for an absentee ballot and immediately after the absentee ballots are printed, it shall be the duty of the commissioner to mail an absentee ballot to the applicant within twenty-four hours. The absentee ballot shall be enclosed in an unsealed envelope bearing a serial number and affidavit. The absentee ballot and unsealed envelope shall be enclosed in a carrier envelope which bears the same serial number as the unsealed envelope. The absentee ballot, unsealed envelope, and carrier envelope shall be enclosed in a third envelope to be sent to the qualified elector.

If an application is received so late that it is unlikely that the absentee ballot can be returned in time to be counted on election day, the commissioner shall enclose with the absentee ballot a statement to that effect. The statement shall also point out that it is possible for the applicant to personally deliver his completed absentee ballot to the office of the commissioner at any time before eight o'clock p. m. on election day.

Section 53.17 provided, as found in 65 G.A. ch. 136, § 241, as amended by 65 G.A. ch. 1101, § 55:

An applicant who is a resident or patient in a health care facility or hospital located in the county to which the application has been submitted shall have his absentee ballot delivered to him by one member of each of the political parties referred to in section forty-nine point thirteen (49.13) of the Code, who shall be appointed by the commissioner from the panel drawn up as provided by section forty-nine point fifteen (49.15) of the Code for the special precinct established by section fifty-three point twenty-three (53.23) of the Code. The persons so appointed by the commissioner shall be notaries public and shall be sworn in the manner provided by section forty-nine point seventy-five (49.75) of the Code for election board members. They may assist the qualified electors in filling out the ballot as provided in section forty-nine point ninety (49.90) of the Code. The voted absentee ballots shall be deposited in a sealed container which shall be returned to the commissioner on the same day.

The persons appointed by the commissioner pursuant to this section shall perform their duties during the three working days preceding the election. They shall receive compensation as provided in section forty-nine point twenty (49.20) of the Code. They shall travel together in

the same vehicle and both shall be present when an applicant casts his absentee ballot.

Plaintiffs claim (1) that both of these sections applied to delivery of absentee ballots to the patients, at least down to the last three working days preceding the election, whereas the House contest decision necessarily held that only § 53.17 governed, and (2) that if the House interpretation is right, the departure from proper procedure by the election commissioner was only an irregularity which would not invalidate the absentee ballots, whereas the House decision necessarily held the departure voided the patients' ballots. Plaintiffs assert the House was wrong on both counts.

Because of an overriding consideration, we find no necessity to resolve either of these claims of plaintiffs. Plaintiffs fail to note that in deciding the election contest the House itself acted as a court, a court created by the Iowa Constitution. Nothing gives disputants any right of appeal to the judicial department from the contest decision of the House. In the exercise of its power, the House could construe §§ 53.8 and 53.17 as it did even though we might or might not construe the sections differently. Likewise in the exercise of its power, the House could decide that certain statutory ballot requirements are mandatory and that deviation from these requirements invalidates the ballots, even though we might hold otherwise in other election contests held in the courts. The House exercised sovereign power, and the courts must respect the prerogative of the House to do so just as the legislature must respect the prerogatives of the executive and the judiciary in the exercise of sovereign powers given to them by the constitution.

The present action is not an appeal from the House decision, as no appeal exists. It is rather in the nature of a collateral attack on that decision and, as we have held, the attack must be founded on substantial *constitutional* deprivations by the House. We may assume that in the view of the courts, the House erred in both respects claimed by plaintiffs—in deciding that § 53.17 alone

controlled and that the requirements of § 53.17 are mandatory and not directory. See *State v. Community School Dist. of St. Ansgar,* 247 Iowa 1167, 78 N.W.2d 86. Those differences of opinion by the House and the courts would not be of constitutional dimensions permitting the courts to interject themselves into an express constitutional function of the House. Plaintiffs are not entitled to judicial relief on their claims regarding statutory interpretation or the effect of deviation from statutory requirements.

IV. Plaintiffs do however claim substantial constitutional deprivations. They say § 53.17 is unconstitutional both facially and as applied.

A. Plaintiffs urge that § 53.17 facially, in setting apart patients as voters and requiring representatives of the two major parties to deliver absentee ballots to them, violates equal protection and due process of law. Iowa Const. Art I, § 9; U.S.Const. Amend. XIV, § 1. This claim, if substantiated, would rise to the level of a substantial constitutional deprivation which would entitle plaintiffs to judicial relief.

The issue of facial unconstitutionality appears to turn on classification; we have no doubt that under its power to regulate voting, the legislature could impose the requirements of § 53.17 on *all* absentee voters. *Morrison v. Springer,* 15 Iowa 304; see *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675. Thus the question is whether the classification of patients separately, and the treatment of them differently from other absentee voters, are valid provisions. This question raises the further inquiry whether the test of constitutionality of the classification is to be the usual one of a rational basis or the more stringent one, in cases involving certain fundamental rights, of a compelling state interest. *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506.

The appropriate test would appear to be the former one of a rational basis. *McDonald v. Board of Election Comm'rs of Chicago,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739. We find no necessity to chose

between the tests, however, for we think the classification in § 53.17 will survive application of either test.

Section 53.17 is not of a discriminatory nature; nothing indicates any invidious attempt to hinder voting on the basis of race, wealth, or other improper basis. Patients may be ill, and the evidence shows beyond question that many patients in health care facilities are very aged. Such vot~rs are particularly susceptible to the blandishments of individuals importuning them for votes. Too, the public has an interest in seeing that ballots are not cast by individuals who no longer possess their mental faculties. Defendants advance a number of other reasons indicating a compelling need for the requirements of § 53.17: protection against last minute electioneering, assurance of a secret ballot, prevention of fraud, insurance that the elector's vote is in fact cast for the candidates of his choice, provision of safeguards similar to those surrounding electors in the presence of election judges at the polls, and supply of voting assistance to electors especially likely to need help.

Rather than invidious discrimination, § 53.17 appears to be a good faith effort to improve the voting process of the class involved. The United States Supreme Court upheld a more questionable classification than this in *McDonald v. Board of Election Comm'rs of Chicago,* 394 U.S. 802, 89 S.Ct. 1404, 22 L.Ed.2d 739. See also Annotation, 97 A.L.R.2d 218, 240. We hold plaintiffs' challenge to the section as unconstitutional on its face is without merit.

■ B. Plaintiff Luse objects in particular that even if the 43 ballots of the patients were invalid, § 53.17 as applied by the House unconstitutionally disfranchised the 92 absentee non-patients including him. He says these 92 absentees were deprived of their voting right under Amendment 30 to the Iowa Constitution. We agree to the extent that we would grant relief if the House, in the election contest, did unconstitutionally deprive Mr. Luse and his class of their voting right. We do not believe, however, that the action complained of rises to the level of a constitutional violation.

A practical problem confronted the House when it found the 43 patient ballots to be invalid. All absentee ballots were together; patient and non-patient ballots were indistinguishable. This is a problem which has faced the judiciary under statutes placing other election contests in the courts. Short of invalidating the entire election, no completely satisfactory answer exists. If all commingled ballots are set aside, as here, some voters with proper ballots are disfranchised. If all commingled ballots are counted, invalid ballots are given effect. If the respective candidates are given the same proportion of votes in the number of valid ballots as they have in all commingled ballots, then some effect is actually given to the bad ballots and, in addition, the proportionate result is actually hypothetical. These problems have caused the courts to reach varying results in court-entertained election contests, including voiding a small number of otherwise valid ballots which were intermixed with invalid ones. Some of the applicable cases are collected in Annotation, 155 A.L.R. 677. Others include *In re Contest of Election of Vetsch,* 245 Minn. 229, 71 N.W.2d 652; *In re Donahay's Contested Election,* 21 N.J.Misc. 360, 34 A.2d 299; *Brooks v. Crum,* 216 S.E.2d 220 (W.Va.); *Terry v. Sencindiver,* 153 W.Va. 651, 171 S.E.2d 480. See also *State v. Community School District of St. Ansgar,* 247 Iowa 1167, 1178, 78 N.W.2d 86, 93 (citing with apparent approval quotation from 18 Am.Jur. Elections §§ 224–225 at 330–331, indicating that when illegal votes taint legal ones, and they are inseparable, vote of entire election district may be rejected); *Brooks v. Fay,* 206 Iowa 845, 220 N.W. 30 (recognizing right of legislature by statute to set aside entire precinct under some circumstances); 26 Am.Jur.2d Elections § 392 at 116; 29 C.J.S. Elections § 127 at 368. Compare *Akizaki v. Fong,* 51 Haw. 354, 461 P.2d 221, with *Haggard v. Misko,* 164 Neb. 778, 83 N.W.2d 483.

Remembering that the House itself acts as a court in election contests for its seats

and that no appeal lies, the House could select the manner of handling the intermixed ballots, and it decided not to count any of them. We might or might not apply a different rule if the election contest were in the courts. But Mr. Luse's challenge regarding the action of the House in setting aside the 92 ballots is not of constitutional proportions which would justify judicial relief. The situation is akin to the previous one involving what we found to be a nonconstitutional challenge to the interpretation of § 53.17.

We intimate no opinion on a situation in which, while an election itself is upheld, a large proportion of the total vote in the election is set aside because of the invalidity of some intermixed ballots. Here only 135 ballots out of a total of 9202 were not counted.

The trial court properly dismissed the petition.

AFFIRMED.