BUENAVENTURA ESTEVES LÓPEZ, peticionario, *v.* CRISTINO BERNAZARD, SECRETARIO DE LA CÁMARA DE REPRESENTANTES, NOEL CALERO, PARTIDO POPULAR DEMOCRÁTICO, y LCDO. GERINELDO BARRETO PÉREZ, ADMINISTRADOR GENERAL DE ELECCIONES.

*Número:* MC-81-1          *Resuelto:* 9 de enero de 1981

586

*Nelson Pagán Rodríguez, Heriberto Torres Villanueva, Carlos Santos Correa, Luis E. López Correa, Héctor Ramos, Héctor Laffitte, Benny F. Cerezo* y *Héctor Reichard, Jr.,* abogados del peticionario; las otras partes no comparecieron.

PER CURIAM: El 28 de diciembre de 1980, la Comisión Estatal de Elecciones certificó al candidato electo para el cargo de Representante a la Cámara por el distrito Núm. 16. El perdedor impugnó este acto tres días más tarde ante la Junta Revisora Electoral y el 1 de enero de 1981 recurrió a este foro para que, en auxilio de nuestra jurisdicción, suspendamos los efectos de la certificación de referencia y ordenemos al señor Secretario de la Cámara de Representantes que se abstenga de juramentar al candidato certificado.

El escrito presentado ante nuestra consideración es lacónico en extremo. Se afirma simplemente que el peticionario perdió la elección por ciento veintisiete votos, pero que hay ciento cincuenta papeletas recusadas que, a su juicio, fueron adjudicadas indebidamente a su contrario. Se alega también que este caso es idéntico al del distrito Núm. 12 y se plantean interrogantes sobre el alcance en estas circunstancias de la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico. Se sostiene que esta disposición nos impide actuar en este caso.[1]

---

[1] Esta disposición provee:

"Cada cámara será el único juez de la capacidad legal de sus miembros, de la validez de las actas y del escrutinio de su elección, elegirá sus funcionarios, adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno; y con la concurrencia de tres cuartas partes del número total de los miembros de que se compone, podrá decretar la expulsión de cualquiera de ellos por las mismas causas que se señalan para autorizar juicios de residencia en la sección 21 de este Artículo. Cada cámara elegirá un presidente de entre sus miembros respectivos."

## I

### *La Jurisdicción del Tribunal*

■ ¿Significa la disposición constitucional citada que al constituirse las Cámaras, o aun antes de constituirse, si se traspone el 1ro de enero de 1981 u otra fecha mágica, cesa la jurisdicción de este Tribunal sobre controversias como la presente? La contestación es que no. Cada Cámara es "el único juez de la capacidad legal de sus miembros . . . . y del escrutinio de su elección", pero primero tiene que constituirse conforme a la ley y completarse el escrutinio y los otros trámites que nuestro derecho exige.

La Cámara de Representantes no se ha constituido todavía ni puede constituirse hasta que se cumpla con las disposiciones legales correspondientes. El Art. 22 del Código Político, 2 L.P.R.A. sec. 3, prescribe:

> En el día y hora prescritos en la sec. 1 de este título el Secretario de la Cámara, o en caso de ausencia o incapacidad de éste, el miembro electo de más edad, ocupará la presidencia. Llamará éste al orden a los miembros electos de la Cámara de Representantes y leerá la lista de los distritos electorales. Al ser llamados, deberán los miembros electos presentar sus certificados y prestar el juramento de su cargo. Hecho esto, la Cámara de Representantes procederá a la elección de sus oficiales, siempre que se hallare presente el número necesario para constituir quórum.

■ La Sec. 12 del Art. III de la Constitución del Estado Libre Asociado define el término quórum:

> Una mayoría del número total de los miembros que componen cada cámara constituirá quórum . . . .

El número total de miembros que componen la Cámara es de 51 representantes, de acuerdo con la Sec. 2 del Art. III de la Constitución del Estado Libre Asociado. Aun después de constituirse la Cámara, este Tribunal retiene jurisdicción para resolver las impugnaciones pendientes ante los organismos

electorales y esta facultad no puede coartarse hasta tanto se ejercite a plenitud, conforme lo ordena la Constitución.

■ Fuera de la consideración que antecede, este Tribunal señaló desde hace cuarenta años, en *Ibáñez* v. *Swope, Gobernador*, 58 D.P.R. 20, 23 (1941), la frontera entre el poder legislativo y el judicial en casos de esta naturaleza. Citando un conocido caso de Nueva York, expresamos:

> Es verdad que el Congreso es el juez de la capacidad de sus propios miembros y que el Congreso está actualmente en sesión. Pero es nuestro deber exigir a los oficiales públicos del Estado que cumplan con las leyes del Estado . . . . No se ha expedido todavía certificado de elección a ningún candidato; el escrutinio no ha sido transmitido a la Cámara de Representantes, *y ninguno de los dos candidatos ha sido todavía aceptado ni ha prestado juramento del cargo como miembro. El certificado de elección crea un derecho prima facie y debe exponer un resultado verdadero.* Si el certificado se hubiera expedido ya y *el representante hubiera jurado su cargo,* la situación sería distinta y envolvería entonces cuestiones de las cuales no intentaríamos conocer. Pero *hasta que el certificado haya sido enviado a la Cámara correspondiente y se haya actuado sobre el mismo, las cortes del Estado están abiertas al candidato que alegue que se va a expedir el certificado en violación de la ley.* (Énfasis suplido en el original.)

Véanse: *Busky* v. *Amos*, 310 So.2d 468 (Ala. 1975); *Morgan* v. *Hatch*, 274 N.W.2d 563 (N.D. 1979); *Kuhn* v. *Beede*, 249 N.W.2d 230 (N.D. 1976); *Wickersham* v. *State Election Board*, 357 P.2d 421 (Okl. 1960); *Comer* v. *Ashe*, 514 S.W.2d 730, 741 (Tenn. 1974). Los tribunales tienen amplios poderes aun para examinar actuaciones alegadamente inconstitucionales del Poder Legislativo cuando ejerce su función como juez de las cualificaciones de sus miembros y para determinar que la actuación legislativa cumple con el debido procedimiento de ley. Todas estas cuestiones son de naturaleza justiciable. *Lose* v. *Wray*, 254 N.W.2d 324, 327 (Iowa 1977); *Bond* v. *Floyd*, 385 U.S. 116 (1966); *Powell* v. *McCormack*,

395 U.S. 486 (1968); *McCarley* v. *Sanders*, 309 F.Supp. 8 (D.C. Ala. 1970); *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977).

█ En el caso bajo nuestra consideración, no se ha actuado sobre el certificado de elección, ni se ha terminado el proceso de impugnación. El Tribunal está facultado para resolver la controversia.

El peticionario cita como única autoridad en contrario a *Santa Aponte* v. *Srio. del Senado*, supra. El caso es inaplicable al presente. En *Santa*, el señor Santa Aponte fue certificado, juró su cargo y se le dio asiento en un Senado debidamente constituido. No estaba pendiente ningún procedimiento administrativo o judicial.

## II

### La Improcedencia del Recurso

█ El Art. 6.014 de la Ley Electoral, Ley Núm. 4 de 20 de diciembre de 1977 (16 L.P.R.A. sec. 3274), dispone que:

> Cualquier candidato que impugnare la elección de otro deberá presentar ante la Junta . . . un escrito exponiendo bajo juramento la razón o razones en que fundare el mismo, las cuales deberán ser de tal naturaleza que, de probarse, bastarían para cambiar el resultado de la elección.

Esta disposición entraña la adopción en Puerto Rico de la norma de medir las impugnaciones post-electorales por la probabilidad de su resultado. Bajo esta doctrina la parte que cuestiona una elección debe demostrar prima facie que existe una probabilidad razonable de que pueda variar el resultado, que tal cambio es más plausible que implausible. Starr, *Federal Judicial Invalidation as a Remedy for Irregularities in State Elections*, 49 N.Y.U.L. Rev. 1092, 1124 (1974); Finkelstein y Robbins, *Mathematical Probability in Election Challenges*, 73 Col. L. Rev. 241 (1973); *Ippolito* v. *Power*, 241 N.E.2d 232 (1968); *De Martini* v. *Power*, 262 N.E.2d 857 (1970). No puede fundamentarse una impugnación en

meras conjeturas, generalidades, especulaciones o posibilidades remotas sobre su éxito eventual.

El caso de autos contiene tan solo la afirmación desnuda de que el promovente perdió por 127 votos, pero que existen 150 papeletas recusadas. No hay indicación prima facie sobre la posible validez de esas recusaciones y la probabilidad consiguiente de que el resultado se altere. Se está al simple albur de que existan al menos 128 recusaciones bien fundadas entre el total de 150 existentes.

El caso del Distrito Representativo Núm. 12, *Díaz* v. *Srio. Cámara de Representantes*, 110 D.P.R. 547 (1980), es muy distinto. La diferencia entre los candidatos fue de 69 votos. El escrutinio se condujo antes de nuestra decisión en *P.P.D.* v. *Barreto Pérez*, 110 D.P.R. 376 (1980). Los resultados certificados no incluyeron, por tanto, contrario a nuestra determinación en dicho caso, las papeletas marcadas sobre el cuadrante, que montan a 21, ni excluyeron las papeletas recusadas que no contienen una contradeclaración del elector para refutar el fundamento de la recusación, número que no podrá determinarse hasta tanto se abran los paquetes electorales. La operación a realizar respecto a estos dos renglones, que de por sí podrían alterar el resultado, dada la estrechez del margen de la victoria, es sencilla, de orden puramente aritmético. Si a estos datos se añade la alegación del promovente en *Díaz* de que existen más de 140 papeletas recusadas, claramente se rebasa el marco de la conjetura y se entra en el campo de la probabilidad razonable. En *Díaz* procedía en derecho la expedición de un interdicto en auxilio de nuestra jurisdicción. En el caso de autos, no.

*Por carencia evidente de mérito, se deniegan, en consecuencia, las mociones de 1 y 3 de enero de 1981 presentadas por el señor Esteves López, sin perjuicio de su derecho a continuar el procedimiento de impugnación iniciado ante la Junta Revisora Electoral. Se dictará sentencia de conformidad.*

Los Jueces Asociados Señores Dávila e Irizarry Yunqué emitieron votos separados en los cuales están conformes con la Parte I de la Opinión, relativa a la jurisdicción del Tribunal, y concurren en el resultado. El Juez Asociado Señor Martín concurre en el resultado en opinión separada, por entender que este Tribunal carece de jurisdicción. El Juez Asociado Señor Negrón García emitió opinión disidente.

—O—

Voto separado del Juez Asociado Señor Dávila.

San Juan, Puerto Rico, a 9 de enero de 1981

Concurro con la Parte I de la opinión del Tribunal, pero visto el hecho de que el Tribunal está de acuerdo con que el peticionario continúe ante la Junta Revisora Electoral el procedimiento de impugnación por él iniciado, soy del criterio de que resulta académica la petición de *injunction* en auxilio de jurisdicción en cuanto al Distrito Representativo Núm. 16, visto lo dispuesto en el Art. 6.015 de la Ley Electoral al efecto de que, en caso de senadores y representantes, la presentación de un escrito de impugnación en tiempo impedirá que se certifique la elección del candidato impugnado.

Estuve de acuerdo en conceder el auxilio de jurisdicción solicitado en el caso del Distrito Representativo Núm. 12, vista la alegación bajo juramento de que la Comisión Estatal de Elecciones se proponía certificar inmediatamente al candidato impugnado en ese distrito representativo.

—O—

Voto concurrente del Juez Asociado Señor Irizarry Yunqué.

San Juan, Puerto Rico, a 9 de enero de 1981

Concurro en la decisión que toma el Tribunal de denegar el *injunction* solicitado por el peticionario sin perjuicio de que se continúe ante la Junta Revisora Electoral el proceso de

impugnación por él iniciado. Estoy conforme con la Parte I de la opinión *per curiam* sobre el aspecto de nuestra jurisdicción. No suscribo la Parte II de dicha opinión. Me explicaré.

No participé en la consideración y decisión tomada el 31 de diciembre de 1980 en el recurso MC-80-75, *Díaz* v. *Srio. Cámara de Representantes*, 110 D.P.R. 547 (1980). Considero, sin embargo, que no debió expedirse el *injunction* en dicho caso, por entender que correspondía en primera instancia a la Junta Revisora Electoral resolver sobre la cuestión. El mismo fundamento es aplicable al presente caso. Proveería no haber lugar al ejercicio de nuestra jurisdicción original.

—O—

Opinión disidente en parte y concurrente en parte emitida por el Juez Asociado Señor Martín.

San Juan, Puerto Rico, a 9 de enero de 1981

En el caso instado por Manuel Díaz Collazo, candidato del Partido Popular Democrático a representante a la Cámara por el distrito Núm. 12, que es similar al presente caso y en el que impugnaba la certificación expedida por la Comisión Estatal de Elecciones al candidato del Partido Nuevo Progresista Eddie Padilla, objeté, mediante voto disidente, que se expidiera remedio alguno en auxilio de la jurisdicción de este Tribunal, para dejar sin efecto la certificación expedida al candidato del Partido Nuevo Progresista. *Díaz* v. *Srio. Cámara de Representantes*, 110 D.P.R. 547 (1980).

Los fundamentos legales que expresé entonces, los reitero en el presente caso, que persigue el dejar sin efecto la certificación expedida por la Comisión Estatal de Elecciones al candidato del Partido Popular Democrático Noel Calero para el Distrito Representativo Núm. 16.

La opinión emitida hoy en el presente caso considera errónea la posición adoptada por mí en la disidencia del caso de *Díaz*, en el sentido de que, una vez certificado el candidato a representante y llegado el día 1ro de enero subsiguiente a la

elección general sin que la Junta Revisora Electoral hubiese resuelto la impugnación, la Cámara de Representantes asume la jurisdicción para entender en la controversia, y por tal razón, este Tribunal ha perdido la jurisdicción que la Constitución del Estado Libre Asociado confiere con carácter exclusivo a la Cámara de Representantes. ([1])

El apoyo que el Tribunal encuentra en el caso de *Ibáñez* v. *Swope, Gobernador*, 58 D.P.R. 20, 23 (1941), para sostener la frontera entre el poder legislativo y judicial en casos de la naturaleza del presente, proviene de una cita en un caso resuelto en Nueva York en 1915, *People ex rel. Brown* v. *Suffolk County*, 216 N.Y. 732, en el que no se había expedido aún certificado de elección a ningún candidato, por lo que no es de aplicación en el caso ante nos. Con la premura que hacemos estas expresiones, no hemos podido localizar la Ley Electoral de Nueva York que regía en dicho Estado en 1915. Lo que sí podemos afirmar es que nuestra Ley Electoral expresamente consigna que:

... En el caso de los Senadores y Representantes, de haberse presentado a tiempo algún escrito de impugnación, no se certificará la elección del candidato impugnado hasta que la Junta resuelva dicha impugnación, *lo cual se hará no más tarde del día 1ro. de enero siguiente a una elección general* .... (Bastardillas nuestras.) 16 L.P.R.A. sec. 3275.

Esto es, la Junta viene obligada a resolver la impugnación antes de la fecha límite del 1ro de enero, y, de no hacerlo así, en mi opinión recae la obligación de hacerlo, por disposición constitucional, sobre la Cámara de Representantes. Constitución del E.L.A., Art. III, Sec. 9. Véase, además, la Ley Electoral, 16 L.P.R.A. sec. 3276.

La fecha límite que impone la ley es crítica, puesto que al siguiente día, o sea, el 2 de enero, por disposición constitu-

---

([1]) Queda a salvo, sin embargo, la función exclusiva de este Tribunal de ser intérprete final de la Constitución. Empero, las circunstancias presentes en este caso no son las apropiadas para el ejercicio de tal facultad. *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977).

cional, comienza el término del cargo de legislador. Constitución del E.L.A., Art. III, Sec. 8.

La única interpretación posible de las dos disposiciones constitucionales citadas es al efecto de que la facultad exclusiva para resolver la controversia aquí planteada recae sobre la Cámara de Representantes, privando así a este Tribunal, así como a la Junta Revisora Electoral, de jurisdicción para entender en el asunto.

Por las consideraciones expuestas precedentemente, desestimaría la petición por falta de jurisdicción. ([2])

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

San Juan, Puerto Rico, a 9 de enero de 1981

Consignamos separadamente las razones que animan nuestra conciencia judicial en el caso de epígrafe. Primero, la similitud básica existente en el carácter de la controversia y la naturaleza del remedio solicitado en este caso, comparado con el dictamen que este Tribunal emitió el 31 de diciembre de 1980 en el recurso de *Díaz* v. *Srio. Cámara de Representantes*, 110 D.P.R. 547 (1980), nos mueve a favorecer un decreto que dispone, en auxilio de nuestra jurisdicción, la suspensión de la certificación expedida por la Comisión Estatal de Elecciones para el Distrito Representativo Núm. 16 a nombre del candidato del Partido Popular Democrático, Noel Calero Bermúdez, hasta tanto recaiga resolución final y firme de la Junta Revisora Electoral en la impugnación promovida ante dicho foro por el peticionario Buenaventura Esteves López, candidato del Partido Nuevo Progresista.

Según advertimos en *Molina* v. *Barreto Pérez*, 110 D.P.R. 513 (1980), "el debido funcionamiento de la Rama Legislativa

---

([2]) Considerando que la cuestión planteada es similar a la del caso de *Díaz*, resuelto el 31 de diciembre de 1980, el Tribunal, al asumir jurisdicción, debió haber declarado procedente el remedio solicitado por el candidato Buenaventura Esteves López en este caso.

se verá cuando menos empañado y posiblemente detenido, mientras dure la incertidumbre en cuando al resultado final y válido de la elección". Con esta perspectiva presente, más recientemente notamos cómo personas y candidatos interesados políticamente en obtener la mayoría númerica de la Cámara de Representantes, sin reparo ético alguno, se convierten en intérpretes constitucionales y críticos de nuestras actuaciones, tratando por esos medios de ejercer indebida presión sobre los integrantes del Poder Judicial, mediante la exacerbación de los ánimos. No nos corresponde al presente evaluar tales conductas. Basta reproducir lo expresado en *P.S.P., P.P.D. y P.I.P.* v. *Romero Barceló*, opinión concurrente y disidente del 17 de octubre de 1980, pág. 312:

"Por lo demás, 'reconocemos las discusiones intelectuales, jurídicas y políticas —serias, histéricas y apasionadas— que generan controversias de esta índole. Como Tribunal colegiado nuestros fallos no están inmunes a la crítica, sea constructiva, sana, injusta o viciosa'." *P.I.P.* v. *E.L.A.,* supra. La naturaleza y dinámica humanas son fluidas y sumamente complejas. Así pues, en una sociedad pluralista existe todo tipo de personalidades —simplistas y complicadas, inteligentes y cerradas, objetivas y prejuiciadas, fanáticas y tolerantes— portavoces que responden a una gama de intereses ideológicos particulares o de grupos, tanto profesionales como partidistas. Según el grado de convulsión social y la crudeza de las luchas de las distintas tendencias en determinado momento, el abanico de percepciones erróneas o distorsionadas y voces hostiles, aun entre y contra personas honorables y de prestígio, varía.

Una vez más, "no podemos evitar pensar que esta ponencia suscite críticas o equívocos torpemente interpretados. Habrá a quienes el simple abordar este tema les resultará ruborizante, mortificante o un tanto irritante. No es ese nuestro deseo. Tampoco será la primera ni última vez que el quehacer judicial genere tales reacciones". *Ortiz Angleró,* supra. Ninguna de esas u otras reacciones disonantes constituirán razones suficientes para que el jurista abdique su jurisdicción, empañe la nitidez de su óptica judicial, opaque la integridad de su ética o abjure los dictados de su conciencia.

Lo que sí aflora en éste y otros recursos relacionados es un deseo de lograr por cualesquiera medios —e independientemente de la corrección, juridicidad y finalidad de la adjudicación de esos escaños— el control de la Cámara a como dé lugar. Anima ese comportamiento la incorrecta interpretación de que, una vez constituido dicho cuerpo, automáticamente éste asume jurisdicción sobre estos contendientes judiciales y se convierte en el único juez de la capacidad legal de sus miembros, de la validez de sus actas y del escrutinio de su elección, al amparo del Art. III, Sec. 9 de la Constitución, inclusive sobre aquellos candidatos no certificados ni juramentados o sobre los cuales pende una impugnación. Esa tesis errónea no puede prevalecer. Pasa por alto que la mencionada disposición constitucional sólo entra en juego una vez el trámite administrativo y judicial sobre la elección y certificación de un candidato a legislador ha finalizado y éste jura. Es el Certificado de Elección, el documento corroborativo individual y colectivo, que, en unión al juramento, origina un estado de derecho constitutivo, tanto institucional como constitucional, y confiere entonces jurisdicción sobre sus miembros. *Santa Aponte* v. *Srio. del Senado*, 105 D.P.R. 750 (1977). En consecuencia, el cuerpo legislativo concernido no tiene facultad constitucional para juzgar y pasar juicio sobre candidatos no certificados ni juramentados y cualquier actuación al efecto sería *ultra vires* y al margen de nuestra Ley Fundamental. Sobre este particular, hace cuatro (4) décadas nos pronunciamos en *Ibáñez* v. *Swope, Gobernador*, 58 D.P.R. 20, 23 (1941) —citando con aprobación de la Corte de Apelaciones de Nueva York *People ex rel. Brown* v. *Suffolk County* 216 N.Y. 732 (1915)— así:

"Es verdad que el Congreso es el juez de la capacidad de sus propios miembros y que el Congreso está actualmente en sesión. Pero es nuestro deber exigir a los oficiales públicos del Estado que cumplan con las leyes del Estado. . . . No se ha expedido todavía certificado de elección a ningún candidato; el escrutinio no ha sido transmitido a la Cámara de Representantes, *y nin-*

*guno de los dos candidatos ha sido todavía aceptado ni ha prestado juramento del cargo como miembro. El certificado de elección crea un derecho prima facie y debe exponer un resultado verdadero.* Si el certificado se hubiera expedido ya y *el representante hubiera jurado su cargo,* la situación sería distinta y envolvería entonces cuestiones de las cuales no intentaríamos conocer. Pero *hasta que el certificado haya sido enviado a la Cámara correspondiente y se haya actuado sobre el mismo, las cortes del Estado están abiertas al candidato que alegue que se va a expedir el certificado en violación de la ley."*