# IN THE SUPREME COURT OF IOWA

No. 19–1598

Submitted October 15, 2020—Filed February 5, 2021

**STATE OF IOWA ex rel. GARY DICKEY,**

Appellant,

vs.

**JASON BESLER,**

Appellee.

---

Appeal from the Iowa District Court for Johnson County, Robert B. Hanson, Judge.

A citizen appeals a district court order denying his application to bring a quo warranto action challenging a judge's title to office. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which Christensen, C.J., and Waterman, McDonald, and Oxley, JJ., joined. Appel, J., filed a dissenting opinion. McDermott, J., took no part.

Gary Dickey of Dickey, Campbell, & Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Jeffrey Thompson, Solicitor General, and Emily Willits, Assistant Attorney General, for appellee.

**MANSFIELD, Justice.**

When does a citizen have standing to bring a quo warranto action challenging someone's right to hold public office? When is an appointment to public office "made"? Most importantly, should courts get involved in deciding whether an appointment was timely made if the person who would otherwise get to make that appointment agreed to treat it as timely made?

This case presents all these questions. In May 2018, two finalists were sent to the Governor for a district judge position. The Governor had thirty days to appoint one of them; if she failed to do so, the chief justice was required to make the appointment. On the thirtieth day, a Thursday, the Governor communicated to her chief of staff—but not to the nominees or the secretary of state—the identity of the nominee she had selected. The following Monday, the Governor told this person he had been selected and signed his commission. About a week and a half later, responding to a communication from the Governor's office, the chief justice's legal counsel confirmed in writing that the chief justice "defer[red] to and accept[ed]" the Governor's view that her appointment was timely.

No one directly involved in the appointment process has ever challenged this judicial appointment, including the other nominee. However, in the fall of 2018, a private citizen applied for leave to file a quo warranto action seeking a determination that this judge was holding his office unlawfully. The district court denied the citizen's application, and he appealed.

On appeal, we now affirm the district court's judgment, although our reasoning differs somewhat from the district court's. We conclude that this case presents a nonjusticiable controversy, in that both the Governor

and the chief justice deferred to and accepted the view that the appointment was timely.

## I. Facts and Procedural Background.

In April 2018, the chief judge of the sixth judicial district convened that district's judicial nominating commission to fill a district judge vacancy created by a retirement. *See* Iowa Code § 46.12(1) (2018). A letter invited applications. The letter advised applicants that they would be interviewed by the commission on May 21 and, following the interviews, the commission would send two nominees to the Governor.

The commission interviewed fifteen candidates on May 21. The next day, May 22, the chief judge transmitted the names of two nominees to the Governor. *See id.* § 46.14(1). One was Jason Besler.

On June 11, the Governor interviewed both nominees. On Thursday, June 21, the thirtieth day after the chief judge's transmittal letter, the Governor told her chief of staff that she had made a final decision: she was appointing Besler to fill the vacancy. However, no one communicated the decision to Besler. The following Monday, June 25, the Governor called and wrote Besler to inform him of his appointment. That day, she also signed Besler's commission.

Iowa law provides, "If the governor fails to make an appointment within thirty days after a list of nominees has been submitted, the appointment shall be made from the list of nominees by the chief justice of the supreme court." *Id.* § 46.15(2). In addition, article V, section 15 of the Iowa Constitution states, "If the governor fails for thirty days to make the appointment, it shall be made from such nominees by the chief justice of the supreme court."

Recognizing there could be an issue with the timing of Besler's appointment, the Governor's chief of staff contacted the chief justice's legal

counsel.[1]  On July 6, the chief justice's legal counsel responded in writing as follows:

> The chief justice asked me to write to you regarding the appointment process for the most recent district judge position in the 6th judicial district.  I hope I do not sound too formal, but I think it is important to speak in a way that captures the true thoughts and feelings of the chief justice about the essential need for trust in government and its application to this matter.

> Those authorized to act in government must often also decide what is required to be done to carry out their responsibilities.  This is true in making a judicial appointment under the Constitution.  It means it is up to the governor to give meaning to the constitutional directive for judicial appointments to be made within thirty days.  This decision is not unlike many decisions that must be made throughout government each day to carry out the responsibilities within each branch of government.  Indeed, it is a critical part of our democratic process and the reason public officials take an oath to support the Constitution and the law.  The chief justice understands and appreciates the responsibility of the Governor and other public officials to make such decisions, and views that authority and discretion with the greatest deference and respect.  He believes respect and comity from within government is as essential to achieving greater public trust and confidence of government, as are the checks and balances built into government.

> In practice, the chief justice has always considered a judicial appointment was made when it was communicated to the nominee.  This communication from the governor to the nominee is a time-honored practice that every judge in this state has experienced, and an honor no judge has ever forgotten.  To my knowledge, it is a practice that has always occurred within thirty days of the nomination by the judicial nominating commission.  Nevertheless, this long-standing practice does not mean judicial appointments cannot be made in other ways.

> With the recent district judge appointment in the 6th judicial district, the Governor's Office communicated to the chief justice, the secretary of state, and the public that the appointment of Jason Besler as district judge was made on Thursday, June 21, 2018, which was day thirty following the nomination.  You have further communicated that Governor

---

[1]Sadly, after the events covered by this appeal, the chief justice passed away from a sudden heart attack on November 15, 2019.

Reynolds made "the verbal appointment" on that date, but did not notify Besler or issue a public statement on the appointment until Monday, June 25, 2018. Although the appointment was not communicated to Besler or made public until Monday, June 25, Governor Reynolds determined that the appointment was made on June 21 when she made the decision to select Besler. Consequently, the chief justice respectfully defers to and accepts the decision by Governor Reynolds that this appointment was made on June 21.[2]

Later, information about the timing and circumstances of Besler's appointment became public. On October 9, Gary Dickey wrote the Johnson County Attorney requesting that she pursue a quo warranto action against Besler challenging his entitlement to his office pursuant to Iowa Rule of Civil Procedure 1.1302(1). On October 19, the county attorney responded that she would not be filing such an action. Dickey also visited by phone with a senior official in the attorney general's office who advised that the attorney general would not be bringing a quo warranto action.

Thus, on November 1, Dickey filed his own application for leave to file a petition for writ of quo warranto in the Iowa District Court for Linn County. He alleged that the Governor had failed to appoint Besler by the June 21 deadline for making an appointment, and therefore Besler was holding the office of district judge unlawfully.

The attorney general's office filed a resistance to Dickey's application on behalf of Besler. The resistance asserted three separate grounds why the action should not go forward. First, according to the resistance, Dickey did not have standing. Second, "principles of comity and separation of powers" dictated that the action should not proceed. Third, the Governor had in fact appointed Besler within the required thirty days.

---

[2]On July 9, the chief justice sent a letter to Besler on supreme court letterhead congratulating him on his appointment.

At the request of the chief judge of the sixth judicial district, we directed that the case be assigned to a judge of another judicial district. Subsequently, on February 18, 2019, the district court held a hearing on Dickey's application. On April 23, it issued a ruling denying it. In substance, the district court's order concluded that the Governor had appointed Besler within the required thirty days.

Dickey moved for reconsideration under Iowa Rule of Civil Procedure 1.904(3). His motion urged that the court had improperly considered matters other than standing. Dickey also argued that the court had resolved factual disputes in its decision. In particular, he said he "does not accept a[t] face value the claim that Governor Reynolds communicated her appointment to her chief of staff [on June 21, 2018]." Lastly, Dickey asked the court to enlarge its ruling to find that he did have standing. The court denied Dickey's motion in a written order.

Dickey appealed, and we retained his appeal. In the meantime, Besler has continued to serve as a judge of the sixth judicial district. Judge Besler was retained in office by the voters on November 3, 2020.

## II. Standard of Review.

"We review questions of standing for correction of errors at law." *Homan v. Branstad*, 864 N.W.2d 321, 327 (Iowa 2015). We also review questions of statutory interpretation for correction of errors at law. *See Doe v. State*, 943 N.W.2d 608, 609 (Iowa 2020). Whether an action should be dismissed as nonjusticiable is likewise reviewed for correction of errors at law. *See King v. State*, 818 N.W.2d 1, 8 (Iowa 2012).

## III. Legal Analysis.

On appeal, Dickey argues that he had standing to bring a quo warranto action and that the district court erred in reaching anything more than standing—i.e., the merits of the underlying challenge. Besler,

represented again by the attorney general, responds with the same three arguments he asserted below: (1) Dickey lacks standing; (2) as a matter of comity, this court should not second-guess an appointment that the only other appointing authority—namely, the chief justice—has accepted as timely and valid; and (3) the Governor's appointment was timely anyway. In his reply brief, Dickey not only reiterates his points about standing, he contends that the controversy is justiciable and not a political question.

**A. Standing**. We begin with standing to bring a quo warranto action. In Dickey's view, that is the only issue that should be decided now.

"Generally speaking, title to office can only be tested by proceedings in the nature of quo warranto." *Clark v. Murtagh*, 218 Iowa 71, 73, 254 N.W. 54, 55 (1934); *see also Iowa Farm Bureau Fed'n v. Env't Prot. Comm'n*, 850 N.W.2d 403, 423–24 n.6 (Iowa 2014). Iowa Rule of Civil Procedure 1.1302 prescribes who may bring a quo warranto action:

> 1.1302(1) The county attorney of the county where the action lies has discretion to bring the action, but must do so when directed by the governor, general assembly or the supreme or district court, unless the county attorney may be a defendant, in which event the attorney general may, and shall when so directed, bring the action.

> 1.1302(2) If on demand of any citizen of the state, the county attorney fails to bring the action, the attorney general may do so, or such citizen may apply to the court where the action lies for leave to bring it. On leave so granted, and after filing bond for costs in an amount fixed by the court, with sureties approved by the clerk, the citizen may bring the action and prosecute it to completion.

It is noteworthy that rule 1.1302(2) allows "any" citizen to make a demand on the county attorney. If the county attorney fails to bring the action, the citizen may apply to the court where the action lies for leave to bring the action. In short, under the terms of the rule, standing is conferred on *any*

citizen, so long as the citizen has first made a demand on the county attorney and the county attorney has declined to act.

Besler urges us to apply traditional standing doctrine, which requires an injury in fact. But rule 1.1302(2), unlike Iowa Code section 17A.19, does not require a person to be "aggrieved or adversely affected." *See Dickey v. Iowa Ethics & Campaign Disclosure Bd.*, 943 N.W.2d 34, 37–41 (Iowa 2020) (finding that Dickey lacked standing in a different case that was filed under section 17A.19).

Our precedent regarding standing to bring a quo warranto action has not been monolithic. Rather, rocks of different sizes and shapes have been strewn along the way. In *State ex rel. v. Barker*, we held that a taxpayer of the city served by a waterworks system had standing to bring a quo warranto action challenging the appointment of certain waterworks trustees. 116 Iowa 96, 99, 89 N.W. 204, 205 (1902). We said,

> A private citizen and taxpayer is undoubtedly interested in the duties annexed to the several public officials who are authorized to levy taxes. This is not a contest over an office, as were many of the cases cited in appellees' brief, but a matter of public interest, in which relator has a special interest by reason of being a contributor to the funds.

*Id.*

In *State ex rel. Welsh v. Darling*, we assumed for purposes of the decision that a Des Moines taxpayer could maintain a quo warranto action to test the right of certain individuals to hold office as members of the city park board. 216 Iowa 553, 554–55, 246 N.W. 390, 391 (1933). We stated,

> The right of relators to maintain an action in quo warranto, under the facts of this case, is earnestly challenged by appellees. The ultimate vital question involved and which goes directly to the public interest is the constitutionality of the aforesaid chapter. Each of the litigants and the public at large are directly and deeply interested in this question. We shall therefore, without deciding or expressing any opinion

thereon, assume that the constitutionality of the law is properly before the court for adjudication.

*Id.*

In *State ex rel. Adams v. Murray*, we distinguished between "a personal action" between "two contesting parties" over an office and a quo warranto action brought by "a private person in his relation to the state" with permission of the court. 217 Iowa 1091, 1096, 252 N.W. 556, 558 (1934). This language suggests standing is broader in quo warranto actions than in a conventional lawsuit.

In *State v. Winneshiek Co-op. Burial Ass'n*, we said,

> Any citizen of the state is qualified to make the demand. No private interest in the question is required. The demand is not a part of the suit but is merely a request that the county attorney bring the action.

234 Iowa 1196, 1198, 15 N.W.2d 367, 368 (1944). In *State ex rel. Cox v. Consolidated Independent School District of Readlyn*, we indicated that any citizens who complied with the quo warranto rule and were "affected by the proposed [school district] consolidation" were qualified as relators to question the legality of the formation of the district. 246 Iowa 566, 576, 68 N.W.2d 305, 311 (1955).

While it may not be possible to reconcile all of these decisions with each other, it seems clear that the required interest to bring a quo warranto action is something less than the "injury in fact" required in other contexts. *Cf. Godfrey v. State*, 752 N.W.2d 413, 417–24 (Iowa 2008) (discussing standing in other contexts). For example, while taxpayer standing normally requires "some link between higher taxes and the government action being challenged," *id.* at 424, the quo warranto cases that refer to the relator's taxpaying status do not mention such a link. *See Darling*, 216 Iowa at 559–64, 246 N.W. at 391–95; *Barker*, 116 Iowa at 99–

100, 89 N.W. at 205. This loosening of traditional standing doctrine makes sense because quo warranto, almost by definition, is a proceeding in "the public interest." *See Hearth Corp. v. C-B-R Dev. Co*, 210 N.W.2d 632, 635 (Iowa 1973) ("Quo warranto or an action in the nature of quo warranto is a special proceeding and strictly statutory in character. It is available only where the act complained of is of a public interest and may not be invoked for the redress of a private right or grievance." (quoting *State ex rel. Robbins v. Shellsburg Grain & Lumber Co.*, 243 Iowa 734, 737, 53 N.W.2d 143, 144 (1952))). And, as already noted, rule 1.1302 itself contains no standing requirement beyond citizenship.[3]

For these reasons, we conclude that any citizen who seeks to bring a quo warranto action to challenge an individual's right to hold public office has standing if the citizen can articulate a colorable interest in the subject matter—such as Dickey's contention that he is a practicing attorney in the sixth judicial district.

There is another reason why we should reach this conclusion. Seven years ago, in *Iowa Farm Bureau Federation v. Environmental Protection Commission*, we held that the de facto officer doctrine could sometimes bar even a contemporaneous challenge to a public official's authority to act. 850 N.W.2d at 422–31; *see also id.* at 436 (Waterman, J., concurring in part and dissenting in part) ("According to the majority's view of the de facto officer doctrine, the only way to stop an unqualified public official

---

[3]We recognize that it appears to be a prevailing rule elsewhere that:

> A private relator must have a special interest in order to assert a claim in quo warranto. Where a private relator seeks to bring a quo warranto action to try title to an office that the relator does not claim personally, the very fact that the relator is not seeking the office may be fatal where this is deemed to make the interest insufficient.

65 Am. Jur. 2d Quo Warranto § 76, at 141 (2011) [hereinafter Am. Jur. 2d] (footnote omitted).

from voting or acting is to bring a quo warranto proceeding to get her or him removed."). In other words, *Iowa Farm Bureau Federation* recognizes that in some cases, both collateral *and direct* attacks on an official's authority may be untimely. Therefore, asking a citizen to wait for a concrete injury may in some instances be asking the citizen to wait too late. Dickey has standing.

**B. Justiciability**. We now turn to Besler's second contention—that Dickey's proposed quo warranto proceeding would be nonjusticiable. Although that was not the basis for the district court's ruling, it was raised below and reiterated in the briefing to this court. "It is well-settled that we may affirm a district court ruling on an alternative ground provided the ground was urged in that court." *St. Malachy Roman Cath. Congregation of Geneseo v. Ingram,* 841 N.W.2d 338, 351 n.9 (Iowa 2013).

Besler insists that quo warranto is not available to challenge the timeliness of an appointment that *the only other official with appointment authority* accepts as timely. As he states in his brief,

> [T]he Iowa Constitution clearly leaves to the chief justice the determination whether a judicial appointment is timely made. Chief Justice Cady carefully considered the question and explained his conclusion in a public letter from his counsel. Under the plain language of the Constitution and Iowa Code § 46.15, once the chief justice has declined to make the appointment, no further remedy is available, and the question is nonjusticiable.

Initially, Dickey responds that when deciding whether to grant a citizen leave to pursue a quo warranto action, courts may only consider the citizen's standing. This seems incongruent with the requirement that the citizen first obtain "leave." *See* Iowa R. Civ. P. 1.1302(2) (stating that a citizen "may apply to the court . . . for leave" and may bring an action "[o]n leave so granted"). The word "leave" suggests that the court can perform a meaningful screening function.

In the context of "leave" to file amended pleadings under Iowa Rule of Civil Procedure 1.402(4), we have held that the district court has discretion to deny leave when the amended pleading asserts a legally invalid claim. *See Daniels v. Holtz*, 794 N.W.2d 813, 825 (Iowa 2010) (affirming the denial of leave to add certain claims under the attorney disciplinary rules in a civil action because those rules "do not create a basis for civil liability"); *Midthun v. Pasternak*, 420 N.W.2d 465, 468 (Iowa 1988) ("[W]here a proposed amendment to a petition appears on its face to be legally ineffectual, it is properly denied."). Logically, a district court considering an application to file a quo warranto suit should be able to undertake the same sort of screening.

Long ago, we said that whether to allow a quo warranto action "is a matter addressed to the discretion of the court or judge preliminary to the action, and is not open to dispute either upon the trial or upon appeal." *State ex rel. Heffelfinger v. Brown*, 144 Iowa 739, 744, 123 N.W. 779, 781 (1909). This staking-out of unreviewable discretion is probably no longer good law. Still, inherent in the concept of leave is the notion that district courts have some leeway to stop meritless quo warranto petitions from going forward by denying leave to bring them.[4]

Moreover, there are practical reasons not to end our analysis with a resolution of standing, leaving everything else to be decided in the future.

---

[4]This appears to be consistent with the general rule in other jurisdictions:

> An application for leave to institute quo warranto proceedings is not generally granted as a matter of course, but is addressed to the court's discretion, even where the statute provides that a private relator may institute the proceedings upon refusal of the state's attorney to do so. The court or judge to whom the application is addressed must determine whether there is probable ground for the proceeding and whether the public interest or welfare requires it.

65 Am. Jur. 2d § 67, at 133 (footnotes omitted).

Besler became a district court judge two and half years ago. If he holds that office wrongfully, as Dickey claims, it would better to say so now.

The justiciability issue boils down to this: Person A had thirty days to make an appointment. If Person A failed to make the appointment, Person B was required to make the appointment. No one other than Person A and Person B had authority to make the appointment. Person B has deferred to and accepts Person A's appointment. We need to decide whether a quo warranto petition is available to challenge an appointment when both officials with any possible authority to make the appointment accept the same appointment.

We conclude that judicial relief is unavailable in these circumstances. As a matter of respect and comity, our chief justice deferred to and accepted the Governor's decision that the appointment had been made by her on the thirtieth day. There is no reason to second-guess the chief justice's act of statesmanship. He would have been the only proper person to make the appointment if the Governor failed to make the appointment by the thirtieth day. He declined to do so and chose, instead, to accept the Governor's appointment. Otherwise stated, the appointment power is entrusted by the Iowa Constitution and the Iowa Code in two persons—the Governor and the chief justice—alone. Both of them having accepted the Governor's exercise of that authority as timely, there is nothing for a court to decide.

In *State ex rel. Turner v. Scott*, we turned down a quo warranto action brought by the attorney general to challenge the defendant's right to hold the office of state senator on the ground he had not been an inhabitant of the state for the one-year period preceding his election as required by article III, sections 4 and 5 of the Iowa Constitution. 269 N.W.2d 828, 829 (Iowa 1978). We reasoned that the action was a nonjusticiable political

question because the senate itself had accepted the defendant's qualifications and article III, section 7 made each house of the legislature the judge of members' qualifications. *Id.* at 830–31.

In a broad sense, the same principle applies here. Article V, section 15 and Iowa Code section 46.15(2) confer appointment authority jointly on the Governor (who has primary authority) and the chief justice (whose authority is secondary). We believe the Iowa Constitution and the Iowa Code leave it up to those officials to decide whether the Governor timely exercised her primary authority. Absent a disagreement, there is no role for the courts. Similarly, there was no role for the courts in the *Scott* case unless the Senate decided Scott was not qualified for a reason not set forth in the Iowa Constitution and Scott sought to challenge that outcome. *See Scott*, 269 N.W.2d at 832 (discussing *Powell v. McCormack*, 395 U.S. 486, 89 S. Ct. 1944 (1969)).

We believe another one of our cases is also relevant. In *State v. Hoegh*, we addressed whether a district court could appoint a special prosecutor where the county attorney had a conflict of interest. 632 N.W.2d 885 (Iowa 2001). We noted that the legislature had recently enacted a statute authorizing county boards of supervisors to appoint special prosecutors. *Id.* at 888. Notwithstanding this legislation, we concluded district courts retained inherent authority to appoint special prosecutors. *Id.* at 889–90. Yet we also concluded that separation-of-powers concerns counseled against the exercise of this inherent authority except in a case of "genuine necessity," which was not present. *Id.* at 890.

So too here, separation-of-powers concerns counsel against a court entertaining a lawsuit challenging an allegedly untimely appointment of a judge when the Iowa Constitution and Iowa Code expressly provide laws and statute expressly provide a way to fix an untimely appointment—i.e.,

the chief justice's exercise of appointment authority—and the chief justice has decided to recognize the appointment as timely.

Also potentially relevant is a recent Kansas precedent. In *Ambrosier v. Brownback*, a chief judge and two district judges brought a lawsuit against the Governor over his refusal to fill a judicial vacancy on an interim basis within ninety days as required by Kansas law. 375 P.3d 1008–09 (Kan. 2016). After receiving applications, the Governor opted instead to allow the voters to fill the position at the next election, an election that was to occur within a few months. *Id.*

The Supreme Court of Kansas rejected the plaintiffs' claim challenging the Governor's failure to fill the vacancy on the ground that the ninety-day time limit was "directory only." *Id.* at 1012. In doing so, the court emphasized that there was no "backup plan" in the legislation to cover the situation where the Governor failed to make the appointment. *Id.* at 1011–12. The court distinguished certain other judicial vacancies, where the chief justice of the supreme court (as in Iowa) "steps in and makes the appointment" if the Governor fails to do so on a timely basis. *Id.* at 1011.

Given this reasoning, the Supreme Court of Kansas would likely regard as a justiciable controversy a *disagreement* between the Governor and the chief justice over the timeliness of a judicial appointment that each potentially had authority to make. But what if the Governor and the chief justice had both acknowledged the appointment was timely? That is what occurred here. It seems inapt for the courts to intervene in that circumstance.

We have said,

A political question may be found when one or more of the following considerations is present:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving the issue; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing a lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*King*, 818 N.W.2d at 17 (quoting *Des Moines Reg. & Trib. Co. v. Dwyer*, 542 N.W.2d 491, 495 (Iowa 1996) (en banc)). "Whether a matter involves a 'political question' is determined on a case-by-case basis and requires an examination of the nature of the underlying claim." *Id.*

Normally we apply the political question doctrine when a matter is entrusted exclusively to the legislative branch, to the executive branch, or to both of them. The term "nonjusticiable" implies that a question is not suitable for *judicial* resolution. Here, the chief justice would not be performing an adjudicative function, but an *executive* function. The issue is which of two officials should exercise this executive function.

Notably, this case does not present any broader question than the timeliness of a specific appointment that has already occurred. No one contends that it would violate some constitutional principle, such as nondelegation, for either the Governor or the chief justice to make the appointment. No one contends that Besler lacks the legally necessary qualifications to serve. Nor is there a vacancy waiting to be filled.[5]

---

[5]Consider the following thought experiment. Suppose the Iowa Constitution instead provided, "If the governor fails for thirty days to make the appointment, it shall be made from such nominees by the presiding officer of the senate." And suppose we had the same facts as in this case except it was the senate president who had agreed to respect the Governor's decision that her appointment was timely. Would we entertain a quo

The present case meets several of the six criteria for a political question. First, determining when an appointment has occurred is not necessarily susceptible to a neat legal answer. The chief justice indicated that traditionally an appointment occurs when the Governor communicates with the nominee. However, as the famous case of *Marbury v. Madison* recognized, an appointment is probably not *irrevocable* until the commission has been signed.[6] 5 U.S. (1 Cranch) 137, 152 (1803). Yet, irrevocability may not be the appropriate test here. It makes sense to use such a test when a successor tries to retract an appointment, as occurred in *Marbury,*[7] but not necessarily in deciding whether a backup appointment process should go into effect. In other words, when an appointment is deemed to have occurred may be highly context-specific.

Additionally, our intervening in this matter would demonstrate a lack of respect for the Governor's and the late chief justice's display of comity toward each other. We would be saying, as a court, that their amicable resolution of a question as to who between the two of them gets to make an appointment was not worthy of our recognition.

Moreover, there is a need for adherence to a political decision already made. In his legal counsel's July 6, 2018 letter, the chief justice made a prudential decision, not necessarily a legal one. Without purporting to

---

warranto lawsuit to remove Judge Besler from office? We should view justiciability the same here.

[6]In *Marbury*, the United States Supreme Court indicated that Marbury's appointment became complete when President Adams signed his commission: "This appointment is evidenced by an open, unequivocal act; and being the last act required from the person making it, necessarily excludes the idea of its being, so far as respects the appointment, an inchoate and incomplete transaction." 5 U.S. (1 Cranch) at 157. Still, the Court denied relief on the ground that it had no jurisdiction. *Id.* at 173–79.

[7]*See also In re Governorship*, 603 P.2d 1357, 1364–65 (Cal. 1979) (following the *Marbury* approach when the Governor sought to retract a judicial appointment that the Lieutenant Governor had made while the Governor was traveling out of state).

decide *himself* whether the Governor had made a timely judicial appointment, he deferred to her view that *she* had done so. He declined to make an appointment of his own. Three days later, he wrote Besler to congratulate him officially on his appointment. Judge Besler has now been on the bench for two-and-a-half years and was retained by the voters in the November 2020 general election. The chief justice has since passed away and been replaced by a new chief justice.[8]

Dickey has a final counterargument. He points out that after he raised the specter of a quo warranto proceeding, the chief justice issued another public statement on October 10, 2018. In that statement, the chief justice indicated that the Governor's determination that she made a timely appointment "deserves respect *unless resolved differently through the legal process established to resolve disputes.*" (Emphasis added.)[9] He

---

[8]Our determination that this case presents a nonjusticiable political question also should be placed in the context of the quo warranto remedy. We have venerable authority that quo warranto is not available for mere irregularities that have been cured. *State v. Minton*, 49 Iowa 591, 594–96 (1878) (deciding that quo warranto could not be used to oust an official based on "a mere irregularity" that was cured).

[9]The full statement is reproduced below:

> With regard to the appointment of Judge Besler, the Governor's Office told Chief Justice Cady that Governor Reynolds properly exercised her constitutional authority to make the appointment in a timely manner. This determination by the governor deserves respect unless resolved differently through the legal process established to resolve disputes. Under the constitution, only one person can exercise the appointment authority at a time. Additionally, the constitution does not give the chief justice any additional authority to "confirm" or "ratify" a judicial appointment made by a governor. The chief justice only has the power to "make the appointment" if the governor fails to do so.

> Chief Justice Cady finds himself in a difficult position, as [are] Jason Besler and litigants in his courtroom. At this time, there is no simple solution. We operate under a system of laws and must rely on that system. Any exercise of authority that does not exist would do far greater damage to our system of justice. Accordingly, the chief justice believes he has no constitutional authority to "ratify" or "confirm" a judicial appointment. The chief justice will also take no action to exercise his constitutional authority to make a judicial appointment at this time. He

declined to "make," "ratify," or "confirm" an appointment of his own at that time. Dickey urges that this statement clarified that there is a justiciable controversy. We disagree. In fact, we see the statement quite differently.

The chief justice's October 10 statement did not retract what he had previously said on July 6. He did not say the Governor's appointment was untimely or that he wanted to make the appointment himself. Rather, he said that he would continue to respect the Governor's decision unless the courts decided otherwise. The October 10 statement was a further act of comity and statesmanship. In this case, it involved deference to the judicial process. That judicial process has now taken its course. For the reasons stated, we have concluded Dickey's quo warranto action is nonjusticiable.

### IV. Conclusion.

For the foregoing reasons, we affirm the judgment of the district court.

**AFFIRMED.**

All justices concur except Appel, J., who dissents, and McDermott, J., who takes no part.

---

will continue to monitor the situation in order to protect the judicial process and all its judges.

**APPEL, Justice (dissenting).**

I respectfully dissent.

In this case, Gary Dickey, pursuant to the ancient but well-established procedure of quo warranto, seeks to challenge the appointment of a district court judge. He claims that a district court judge was not timely appointed by Governor Reynolds under article V, section 15 of the Iowa Constitution. The constitutional provision states, in relevant part, that the Governor has the power to appoint judges from among those nominated by nominating commissions. The provision further provides that "[i]f the governor fails for thirty days to make the appointment, it shall be made from such nominees by the chief justice of the supreme court." Iowa Const. art. V, § 15. The district court refused to grant Dickey leave to file the quo warranto action.

The majority of this court affirms on two grounds. First, it declares that Dickey has presented the court with a "political question" that it cannot decide. Second, the majority concludes that the question posed by Dickey is "nonjusticiable." Both conclusions are wrong.

We have a job to do. Unlike political branches of government, courts cannot simply refuse to consider matters brought before it by citizens because the matter is controversial or unpleasant. Political branches can set their own agenda and decline to consider questions based on pragmatic calculations, but a court cannot do so. There is absolutely nothing wrong with that. That is how the political process works. But the court does not set its agenda; the agenda is set by persons who appear in the courts and ask for resolution of their conflicts. The judicial branch in this state has the duty to decide each and every case brought to us, to do so fairly and dispassionately, and according to law. We have the obligation to decide

cases whether the case is attractive or unattractive, somewhat odd or very odd, controversial or uncontroversial, comfortable or uncomfortable. That is the way we do our job. And I would do it in this case.

## I. Introduction.

**A. Overview of Quo Warranto Cause of Action.** Under article V, section 15 of the Iowa Constitution, when the Governor receives the names of judicial nominees from a judicial nominating commission, the appointment must be made within thirty days. If the Governor fails to make the appointment within thirty days, the power of appointment passes to the chief justice. Iowa Const. art. V, § 15.

In this case, Dickey asserts that the Governor failed to make the appointment of Jason Besler in a timely fashion and that the chief justice has not exercised the power of appointment. As a result, according to Dickey, Besler has not been duly appointed.

Dickey filed his quo warranto action in district court. He characterized his initial filing as an application on behalf of the State of Iowa for leave to file a petition for writ of quo warranto. The district court denied the application by ruling on the merits of the issue underlying the application. The district court concluded that the Governor made the appointment by communicating that fact to her chief of staff on or before June 21 and thereby was within the thirty-day period required by the constitution. Dickey appealed.

**B. Positions of the Parties.** On appeal, Dickey argues that the district court decided the issue on the merits prematurely. He claims that his application met all the requirements of Iowa Rule of Civil Procedure 1.1302 regarding who may bring a quo warranto action. He notes that a quo warranto action under the rules is "triable by equitable proceedings." Iowa R. Civ. Pro. 1.1301. Because the district court denied his application

before his petition was even filed, Dickey claims he was deprived of his opportunity for a hearing on the matter. In other words, Dickey claims his application was legally sufficient and that he was entitled to proceed to an equitable hearing. *State ex rel. Fullerton v. Des Moines City Ry.*, 135 Iowa 694, 714, 109 N.W. 867, 875 (1906) (holding that the granting of leave does not adjudicate a case on the merits).

Dickey further asserts that the district court erred in prematurely ruing on the merits of his application before discovery and an opportunity to present evidence. *Bitner v. Ottumwa Cmty. Sch. Dist.*, 549 N.W.2d 295, 302 (Iowa 1996). Anticipating the likely position of Besler, Dickey asserts he has standing to bring the quo warranto action as a citizen, attorney, and taxpayer.

Besler counters that the district court essentially treated his resistance as a motion to dismiss. According to Besler, the facts were undisputed; namely, that Governor Reynolds had informed her chief of staff of the decision to appoint Besler on June 21, within the thirty-day time limit imposed by the Iowa Constitution.

Further, Besler advances several additional arguments. Besler asserts that the public interest would not be served by allowing the action to proceed. Besler contends that the Iowa Constitution stipulates a clear remedy for an untimely judicial appointment: in such cases the appointment shall be made by the chief justice. According to Besler, under the "plain language" of the Iowa Constitution and Iowa Code section 46.15, no other remedy is available.

Besler also contends that the Iowa Constitution is silent on the question of how the appointment is to become effective. Besler maintains that in *State ex rel. Halbach v. Claussen*, when two applicants for a vacancy on the Iowa Supreme Court both claimed the right to a single position, our

court held that the appointment was valid even though one of the applicants did not comply with filing requirements. 216 Iowa 1079, 1092, 1108–1111, 250 N.W. 195, 201, 208–09 (1933). Besler also cites an attorney general's opinion for the proposition "that 'appointment' for the purposes of [Iowa Code section] 46.16 is the act of the governor in designating, choosing or selecting an individual from those nominated to fill a judicial vacancy." Op. Iowa Att'y Gen. No. 69–10–8 (Oct. 21, 1969), 1969 WL 181659, at *4.

Besler further contends that Dickey lacks standing. Besler argues that in order to have standing, Dickey must show a personal or legal interest in the case and injury in fact. *Godfrey v. State*, 752 N.W.2d 413, 419 (Iowa 2008). Besler additionally claims that exceptions to ordinary standing doctrine for taxpayers or for matters involving the public interest are not implicated in the case.

The majority opinion affirms the judgment of the district court on two grounds. First, the majority concludes that the challenge raised by Dickey to Besler's appointment presents a political question that the court cannot decide. Second, the majority concludes that the question posed by Dickey is nonjusticiable.

As I demonstrate below, both conclusions are wrong. Without question, there is no "textually demonstrable" provision vesting the question of whether the appointment in this case was validly made by another branch of government. And, the notion that the question here— whether the Governor's appointment was timely made—is not so complex and difficult that it involves standards that are not judicially discoverable and unmanageable. If this question is so complicated that this court cannot handle it, the judiciary has a real problem.

**II. Discussion.**

**A. Nature of Quo Warranto Actions.** At common law, title to a public office can only be tested through an action quo warranto. *Clark v. Murtagh*, 218 Iowa 71, 73–74, 254 N.W. 54, 55 (1934). We incorporated quo warranto in Iowa Rules of Civil Procedure 1.1301 to 1.1307. The rules provide that a citizen may bring a quo warranto action in the name of the state if the county attorney has refused to bring the action and the district court grants leave to maintain the action. *State ex rel. Adams v. Murray*, 217 Iowa 1091, 1095, 252 N.W. 556, 558 (1934).

**B. The Political Question Doctrine in Federal and State Courts.**

1. *Introduction.* In applying the political question doctrine, it is critical to understand the texture of the political question doctrine, its strengths and weaknesses, its course and development, and its viability, if any, in similar settings. As will be seen below, the political question doctrine has always been highly controversial. Without doubt, there is tension between the political question doctrine and the fundamental principle of judicial review. Further, application of the political question doctrine even by the United States Supreme Court has generally been reserved to very narrowly limited circumstances.

State courts, of course, are under no obligation to adopt the political question doctrine as developed by the United States Supreme Court. A substantial body of scholarship exists suggesting that the political question doctrine should not apply to states, or should apply to states in a different way, because of differences in the structure of federal and state governments. In any event, there is a rich variety of state court adaptations of the political question doctrine that do not necessarily follow the winding course of United States Supreme Court precedent in the area. In Iowa, the actual holdings of Iowa cases applying the political question

doctrine are consistent with what has been called the "classical" version of political questions. Under the classical view, the doctrine applies only where there is a textually explicit constitutional provision which assigns a power to a branch of government other than the judiciary.

As will be seen below, I would apply the classical view of the political question doctrine in this case. Under the classical view, the political question doctrine would have no application in this case. The details follow.

2. *The foundations of judicial review.* In *Marbury v. Madison*, the United States Supreme Court considered the question of whether President Adams had validly appointed Marbury to a position of justice of the peace in the closing hours of his presidential term. 5 U.S. (1 Cranch) 137, 155 (1803). The first question confronted by Chief Justice Marshall was whether, under the facts and circumstances, the appointment had been made by President Adams. *Id.* at 154–55. The Supreme Court did not duck the apportionment issue, but addressed it head on. In a famous phrase, the *Marbury* Court declared "emphatically the province and duty of the judicial department to say what the law is." *Id.* at 177. Yet, at the same time, Chief Justice Marshall cautioned that certain subjects are political and that the Court would not inquire "how the executive, or executive officers, perform duties in which they have a discretion." *Id.* at 170. According to Chief Justice Marshall, the question of whether Marbury was duly appointed was subject to judicial review and the Court declared that the appointment was complete when the President signed Marbury's commission. *Id.* at 162. Withholding delivery of the commission did not affect Marbury's legal right to the office. *Id.*

Of course, Chief Justice Marshall famously went on to hold, that the Supreme Court did not have original jurisdiction over the matter and, as

a result, Marbury was not entitled to the relief he sought. *Id.* at 173–80. But the Court did not flinch from deciding the question of whether Marbury was duly appointed by President Adams.

The role of judicial review was reemphasized in *Cohens v. Virginia,* when Chief Justice Marshall wrote that:

> The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution. [The judiciary] cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, [the judiciary] must decide it, if it be brought before [them].

19 U.S. (6 Wheat.) 264, 404 (1821).

3. *Development of the "political question" doctrine by the United States Supreme Court.* Although there have been some precursors, the seminal case in which the United States Supreme Court considered what became known as the political question doctrine was *Baker v. Carr.* 369 U.S. 186, 82 S. Ct. 691 (1962). In *Baker,* the Supreme Court considered a challenge to the apportionment plan of the state of Tennessee. *Id.* at 187–88, 82 S. Ct. at 694.

In response to the argument that the Supreme Court should avoid the issue as a "political question," Justice Brennan developed a multi-factored framework for consideration. *Id.* at 217, 82 S. Ct. at 710. After an extensive canvas of the cases, Justice Brennan summarized relevant considerations in an often quoted passage as:

> [O]n the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already

made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.*

After *Baker*, the Supreme Court considered the political question doctrine in several other cases. In *Powell v. McCormack,* the Supreme Court applied the political question doctrine in the context of the qualifications of a person elected to Congress. 395 U.S. 486, 518–49, 89 S. Ct. 1944, 1962–78 (1969). The *Powell* Court discussed at length the scope of congressional power to determine the qualification of its own members, thereby emphasizing the very first prong of the test announced in *Baker. Id.* at 518–22, 89 S. Ct. at 1962–64. The Supreme Court found that Congress had the power to exclude Powell only if he failed to meet certain qualifications specifically stated in Article I, Section 5 of the United States Constitution. *Id.* at 548–50, 89 S. Ct. at 1978–79.

In *Powell,* the Supreme Court emphasized that in order for an issue to be a political question, there must be a "textually demonstrable commitment" to vest Congress with the exclusive power to decide the issue. *Id.* at 548, 89 S. Ct. at 1978. The constitutional text itself must demonstrate a commitment of the issue to another branch of government. *Id.* A general constitutional theory will not suffice under *Powell.* For example, Congress generally is vested with legislative power, but that general allocation of power does not amount to a textually demonstrable commitment to determine the constitutionality of legislation.

Further, *Powell* clearly demonstrates "that denial of judicial power to decide one question does not entail denial of power to decide closely related questions thought to involve a different balance in the division of powers." 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3534, at 669 (3d ed. 2008) [hereinafter

Wright, Miller & Cooper]. Specifically, the Supreme Court focused on Article I, Section 5 as narrowly vesting in Congress the power to judge the qualifications expressly set forth in the constitutional text. There were no implied powers or penumbras extending from the constitutional text. A direct, literal, and exclusive constitutional assignment to another branch of government is required.

Finally, the Supreme Court noted that judicial review of Powell's claim could give rise to a "potentially embarrassing confrontation" with the House of Representatives. *Powell*, 395 U.S. at 548, 89 S. Ct. at 1978. According to the *Powell* Court,

> Our system of government requires that federal courts on occasion interpret the Constitution in a manner at variance with the construction given the document by another branch. The alleged conflict that such an adjudication may cause cannot justify the courts' avoiding their constitutional responsibility.

*Id.* at 549, 89 S. Ct. 1978. So, the teaching of *Powell* is that the judiciary should not decline to answer questions because they are politically embarrassing. Indeed, the opposite is true, namely, that courts have a duty to fairly and impartially decide such questions regardless of the uncomfortable political context. If a court is afraid of the political context, it will not be an independent branch of government.

In *Goldwater v. Carter*, the Supreme Court summarily reversed a lower court decision regarding the President's power to terminate a mutual defense treaty. 444 U.S. 996, 100 S. Ct. 533 (1979) (mem.). Justice Powell filed a concurring opinion. In his concurrence, Justice Powell emphasized in reviewing whether the case presented a nonjusticiable political question that no provision of the Constitution "explicitly confer[red] upon the President the power to terminate [a treaty]." *Id.* at 999, 100 S. Ct. at 534–35 (Powell, J., concurring). Thus, Justice Powell emphasized that the

Constitution did not "unquestionably commit the power to terminate treaties to the President alone." *Id.* As in *Powell*, the Supreme Court engaged in slicing and dicing. While the President had clear general power in foreign affairs, such discretionary authority did not prevent judicial review because the Constitution did not specifically vest the power to terminate treaties with the President. *Id.*

Further, with respect to whether there was a "lack of judicially discoverable and manageable standards for resolving" the case, Justice Powell noted that although resolution of the question of who had the power to terminate a treaty "may not be easy," it required only the application of "normal principles of interpretation to the constitutional provisions at issue." *Id.* at 999, 100 S. Ct. at 535 (quoting *Baker*, 369 U.S. at 217, 82 S. Ct. at 710). Justice Powell emphasized that in a number of cases, the Supreme Court has determined whether one branch of government impinged on the rights of another. *Id.* at 1001, 100 S. Ct. at 536. Justice Rehnquist and three other Justices, however, declared that because the case involved the authority of the President in the conduct of the country's foreign affairs, the political question doctrine applied. *Id.* at 1002, 100 S. Ct. at 536 (Rehnquist, J., concurring).

In *Japan Whaling Ass'n v. American Cetacean Society*, wildlife conservation groups brought an action alleging that cabinet members violated their statutory duty with respect to enforcement of international whaling quotas. 478 U.S. 221, 228–29, 106 S. Ct. 2860, 2865 (1986). In response to a claim that the matter presented a political question, Justice White noted that "not every matter touching on politics is a political question." *Id.* at 229, 106 S. Ct. at 2865. The case, according to Justice White, involved interpretation of a statute and that such interpretation is

"one of the . . . characteristic roles" of the Court. *Id.* at 230, 106 S. Ct. at 2866.

The field of reapportionment has provoked the most controversy in recent political question cases of the Supreme Court. Of course, the foundational case, *Baker,* involved a reapportionment question regarding the principle of one person, one vote. *See Baker,* 369 U.S. at 207–08, 82 S. Ct. at 705; *see also Reynolds v. Sims,* 377 U.S. 533, 573, 84 S. Ct. 1362, 1387–88 (1964).

The Supreme Court revisited reapportionment in a different context in *Davis v. Bandemer.* 478 U.S. 109, 106 S. Ct. 2797 (1986). In *Davis,* the plaintiff claimed that the legislature was engaging in partisan political gerrymandering. *Id.* at 113–18, 106 S. Ct. at 2800–03. The Supreme Court held that the question of political gerrymandering was not a "political question." *Id.* at 126–27, 143, 106 S. Ct. at 2807, 2816.

But nearly twenty years later, the Supreme Court seemed to reverse course. *See Vieth v. Jubelirer,* 541 U.S. 267, 124 S. Ct. 1769 (2004). In *Vieth v. Jubelirer,* a four-justice plurality determined that consideration of the reapportionment questions posed in the case were barred by the political question doctrine. *Id.* at 305–06, 124 S. Ct. at 1792. Justice Kennedy provided the fifth vote in a concurring opinion, but believed the Court should be permitted to intervene in a future reapportionment case if an adequate standard of review could emerge or if the question could be sufficiently narrowed. *Id.* at 309–17, 124 S. Ct. at 1794–99 (Kennedy, J., concurring). Four members of the Court dissented in three opinions. *See generally id.* at 317, 124 S. Ct. at 1799 (Stevens, J., dissenting); *id.* at 342, 124 S. Ct. at 1815 (Souter, J., dissenting, joined by Ginsburg, J.); *id.* at 355, 124 S. Ct. at 1822 (Breyer, J., dissenting).

In *Gill v. Whitford* the Supreme Court came to an inclusive result in a partisan reapportionment case. ___ U.S. ___, ___, 138 S. Ct. 1916, 1929, 1933–34 (2018). But in *Rucho v. Common Cause,* a bare five-member majority declared that partisan gerrymandering raised a political question because there were no manageable standards to decide the question. ___ U.S. ___, ___, 139 S. Ct. 2484, 2506–07 (2019). Justice Kagan wrote a blistering dissent, observing that a number of courts had successfully grappled with the issue and that partisan gerrymandering struck at the very core of democracy. *See generally id.* at ___, 139 S. Ct. at 2509–25 (Kagan, J., dissenting).

Notwithstanding the above, the Supreme Court, at least in the past, has reaffirmed its traditional caution about the application of the political question doctrine. For example, in *Zivotofsky ex rel. Zivotofsky v. Clinton,* the Supreme Court noted that "[i]n general, the Judiciary has a responsibility to decide cases properly before it, even those it 'would gladly avoid.'" 566 U.S. 189, 194, 132 S. Ct. 1421, 1427 (2012) (quoting *Cohens,* 19 U.S. (6 Wheat.) at 404). And, in *INS v. Chadha,* the Court noted "the presence of constitutional issues with significant political overtones does not automatically invoke the political question doctrine." 462 U.S. 919, 942–43, 103 S. Ct. 2764, 2780 (1983).

4. *Academic commentary on the political question doctrine as developed by the United States Supreme Court.* The political question doctrine has been controversial since its inception. In 1976, Professor Louis Henkin wrote a highly critical article arguing that the courts simply need to defer to decisions specifically assigned to other branches of government. Louis Henkin, *Is there a "Political Question" Doctrine?,* 85 Yale L.J. 597, 598–601 (1976). In 1984, Martin Redish published an influential article arguing that the political question doctrine lacked

substantive support. Martin H. Redish, *Judicial Review and the 'Political Question,'* 79 Nw. U. L. Rev. 1031, 1033–39, 1060–61 (1985).

Yet, the political question doctrine as developed by the Supreme Court has its academic defenders. *See, e.g.*, J. Peter Mulhern, *In Defense of the Political Question Doctrine*, 137 U. Pa. L. Rev. 97 (1988) (disputing the idea that the political question doctrine does not exist or should not exist, and instead defending the doctrine but arguing the Court should more clearly develop it).

In more recent years, however, some scholars have emphasized the need to keep the doctrine narrow. For example, one commentator has emphasized that in order to avoid judicial abdication of responsibility the doctrine should be construed narrowly. Harlan Grant Cohen, *A Politics-Reinforcing Political Question Doctrine*, 49 Ariz. St. L.J. 1, 17–18, 47 (2017). Similar concerns were advanced by Rachel E. Barkow, who suggested in 2002 that the Supreme Court itself was inclined to narrow the scope of the doctrine. Rachel E. Barkow, *More Supreme than Court? The Fall of the Political Question Doctrine and the Rise of Judicial Supremacy*, 102 Colum. L. Rev. 237, 253–63 (2002).

One strand of the academic commentary emphasizes what has been called the "classical" approach to political questions. An early expression of the classical theory was presented by Herbert Wechsler, who stated that "the only proper judgment that may lead to an abstention from decision is that the Constitution has committed the determination of the issue to another agency of government than the courts." Herbert Wechsler, *Toward Neutral Principles of Constitutional Law*, 73 Harv. L. Rev. 1, 9 (1959). The theory was more elaborately described by Fritz Scharpf, who described the classical theory as constitutionally based on textual commitments in contrast with more discretionary or prudential approaches to the doctrine.

Fritz W. Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L. J. 517, 535–548, 561–66 (1966).

5. *The political question doctrine in state courts.* The United States Supreme Court has made it clear that the federal political question doctrine does not apply in state courts. *Goldwater*, 444 U.S. at 1005 n.2, 100 S. Ct. at 538 n.2 (Rehnquist, J., concurring). As a result, each state supreme court is free to consider whether to apply the political question doctrine at all in state courts and, if so, to independently develop the doctrine under state constitutional law.

The reception in state courts has been mixed. Recently, the Supreme Court of Pennsylvania rejected the political question doctrine in a reapportionment case, electing to follow a path at variance with the United States Supreme Court's approach to the gerrymander issue in *Rucho*. *League of Women Voters v. Commonwealth*, 178 A.3d 737, 824 (Pa. 2018) (reaching the merits of a reapportionment case). But, the approach of the Supreme Court of Pennsylvania is not an outlier.

One area where state courts have confronted the political question doctrine with some frequency is cases involving claims of a right to education under state constitutional provisions.[10] State education cases often involve the question of enforcement of general constitutional language and have been summarized in recent academic commentary. *See* Nat Stern, *Don't Answer That: Revisiting the Political Question Doctrine in State Courts*, 21 U. Pa. J. Const. L. 153, 188–98 (2018) [hereinafter Stern].

According to the commentary, most courts considering education claims under state constitutions with positive rights education provisions have "not been daunted" by the political questions doctrine in addressing

---

[10]This is a question which was avoided by the court majority in *King v. State* discussed below. 818 N.W.2d 1 (Iowa 2012).

the claims. *Id.* at 192. By way of example, the Supreme Court of Texas held that a constitutional obligation to make "suitable provision" for an "efficient system of public . . . schools" to ensure "[a] general diffusion of knowledge" was justiciable. *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 752–53, 780–81 (Tex. 2005) (quoting Tex. Const. article VII, § 1). The Supreme Court of Ohio considered a constitutional mandate that the legislature maintain a "thorough and efficient" public school system. *DeRolph v. State,* 677 N.E.2d 733, 737 (Ohio 1997) (quoting Ohio Const. art. VI, § 2). The court declared that it would not "dodge [its] responsibility" by deeming the case to present a political question. *Id.* The Supreme Court of Pennsylvania came to a similar conclusion in *William Penn School District v. Pennsylvania Department of Education,* 170 A.3d 414, 457 (Pa. 2017). Several other states have reached similar conclusions. *See Lobato v. State*, 218 P.3d 358, 374–75 (Colo. 2009) (en banc); *Conn. Coal. for Just. in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 217–26 (Conn. 2010); *Gannon v. State*, 319 P.3d 1196, 1217–31 (Kan. 2014) (per curiam) (applying *Baker* factors and concluding education claims justiciable under the Kansas Constitution); *Columbia Falls Elementary Sch. Dist. No. 6 v. State*, 109 P.3d 257, 260–61 (Mont. 2005) (rejecting political question doctrine in context of the review of a constitutional provision requiring the legislature to provide free "quality" public schools); *Leandro v. State*, 488 S.E.2d 249, 253–54 (N.C. 1997); *Abbeville Cnty. Sch. Dist. v. State*, 767 S.E.2d 157, 163–64 (S.C. 2014); *see also* Stern, 21 U. Pa. J. Const. L. at 188–94.

When it comes to internal legislative processes, there is state court authority applying the political questions doctrine to preclude judicial review in some contexts. For example, the Supreme Court of New Hampshire has rejected challenges to the legislative process because the

state constitution grants the legislature authority to establish such procedures. *Baines v. N.H. Senate President*, 876 A.2d 768, 774–76 (N.H. 2005). Similarly in *Mayhew v. Wilder*, a Tennessee appellate court refused to void bills that were allegedly the product of prohibited secret legislative meetings, because the question of when to close a session was a "purely political question." 46 S.W.3d 760, 773–74 (Tenn. Ct. App. 2001); *see also* Stern, 21 U. Pa. J. Const. L. at 198–202.

Yet, there are state court cases that emphasize the necessity of judicial review of legislature rulemaking powers when the rules might infringe on constitutional mandates—cutting against the above cases that seem to reject review. For instance, in *Magee v. Boyd*, the Supreme Court of Alabama emphasized that "[t]he legislature's exclusive power over its internal rules does not give the legislature the right to usurp the function of the judiciary as ultimate interpreter of the Alabama Constitution." 175 So. 3d 79, 105 (Ala. 2015).

In some state court cases, the political question doctrine has been found not to apply in cases involving personnel decisions made by the Governor. For example, In *Arizona Independent Redistricting Commission v. Brewer*, the Supreme Court of Arizona considered a challenge to a removal of a member of the Independent Redistricting Commission for cause. 275 P.3d 1267, 1268–70 (Ariz. 2012). The Arizona court concluded that although the Governor was constitutionally vested with the power to remove the commissioner for cause, review of that decision by the judicial branch was not barred by the political question doctrine because the standards for removal for cause were described in the constitutional provision and therefore were within the sphere appropriate for judicial review. *Id.* at 1274. The court noted that the fact that the lawsuit had significant political overtones "does not automatically invoke the political

question doctrine." *Id.* at 1271 (quoting *Chadha*, 462 U.S. at 942–43, 103 S. Ct. at 2780 (1983)). The Arizona court concluded "it is our duty to interpret and apply the constitutional limits even though the power and decision to remove and concur reside with the Governor and Senate respectively." *Id.* at 1275.

In *McCarthy v. Governor*, the Supreme Judicial Court of Massachusetts considered whether a judge was duly appointed under Massachusetts law. 27 N.E.3d 828, 829–30 (Mass. 2015). In *McCarthy,* the Governor was required to nominate a candidate and obtain the advice and consent of the Executive Council. *Id.* at 830. After the Governor nominated McCarthy, an initial vote by the Executive Council deadlocked, 3–3, with one abstention. *Id.* at 829–30. In a letter to the Governor, the abstainer stated that she was now in favor of the appointment and that the "Council Register will so reflect." *Id.* at 830. The Governor resubmitted the nomination to the Executive Council but McCarthy again failed to obtain necessary votes. *Id.* After McCarthy failed to receive the necessary votes for the second time from the Executive Council, the Governor sent a letter to the Executive Council stating he considered the matter closed. *Id.*

McCarthy, however, claimed that he obtained the necessary advice and consent of the Executive Council when the abstainer in the first vote changed her position. *Id.* The Governor, however, never signed a commission and the Secretary did not issue a commission to McCarthy. *Id.*

The court explained that it was wholly within the Governor's power and discretion to decide whom to nominate. *Id.* But the court noted that the Governor took no action to effectuate McCarthy's appointment. *Id.* at 830–31. It cited *Marbury* for the proposition that a person is appointed "when the last act to be done by the [Governor is] performed." *Id.* at 831

(alteration in original) (quoting *Marbury*, 5 U.S. (1 Cranch) at 157). The court noted that "[a]t a minimum, [appointment] requires that the Governor communicate unequivocally his determination, informed by the Council's advice and consent, to exercise the power of appointment." *Id.* Because the unequivocal communication did not occur, McCarthy was not duly appointed to his position. *Id.* at 831–32. The court did not consider whether the question posed a political question but simply decided the question based on applicable law.

There is also a body of state court cases noting the important role of judicial review in deciding constitutional questions that involve interpretation of specific text. The Supreme Court of Hawaii in *Salera v. Caldwell*, emphasized that "constitutional interpretation" is generally considered "judicial fare." 375 P.3d 188, 201 (Haw. 2016) (quoting *Nelson v. Hawaiian Homes Comm'n*, 277 P.3d 279, 291 (Haw. 2012)); *see also Bd. of Educ. v. Waihee*, 768 P.2d 1279, 1285 (Haw. 1989) ("[T]he matter at hand [is] textual interpretation, which undoubtedly constitutes judicial fare . . . ."). Similarly, the Supreme Court of Vermont has noted that "courts possess power to review either legislative or executive action that transgresses [the] identifiable textual limits [of the Constitution]." *Turner v. Shumlin*, 163 A.3d 1173, 1181 (Vt. 2017) (per curiam) (alteration in original) (quoting *Nixon v. United States*, 506 U.S. 224, 238, 113 S. Ct. 732, 740 (1993)). The Supreme Court of Nebraska has declared that the determination of the meaning of constitutional text "is a judicial function which this court is obligated to perform." *Sarpy Cnty. Farm Bureau v. Learning Cmty.*, 808 N.W.2d 598, 607 (Neb. 2012); *see also* Stern, 21 U. Pa. J. Const. L. at 205 n.346.

There is also a substantial body of academic literature related to the application of the political question doctrine in state court. Hans Linde, a

justice who sat on the Supreme Court of Oregon and advocated the development of independent state constitutional law, wrote in 1984 that the political question doctrine did not apply in state court. Hans A. Linde, *E Pluribus—Constitutional Theory and State Courts*, 18 Ga. L. Rev. 165, 189–90 (1984). At the same time, another scholar found that state courts were applying the political question doctrine on at least some occasions. Nat Stern, *The Political Question Doctrine in State Courts*, 35 S.C. L. Rev. 405, 408–18 (1984) (noting that there is at least some presence of the political question doctrine in state courts).

In 2001, Helen Hershkoff published an influential article emphasizing the differences between state and federal courts. Helen Hershkoff, *State Courts and the "Passive Virtues": Rethinking the Judicial Function*, 114 Harv. L. Rev. 1833 (2001). Among other things, Hershkoff noted that states tend to hear a broader array of questions than would be justiciable under federal law, including "propriety of legislative enactment . . . fiscal matters, budget practices, and claims to government services." *Id.* at 1863–65 (footnotes omitted). She also noted that state constitutions generally "do not reflect the same level of trust in state legislative decisionmaking" as the United States Constitution does with congressional decision-making. *Id.* at 1891–92.

More recently, Oregon Supreme Court Justice Jack Landau, following the path of Hans Linde, canvassed the political question and justiciability doctrines. Hon. Jack L. Landau, *State Constitutionalism and the Limits of Judicial Power*, 69 Rutgers U. L. Rev. 1309 (2017). Justice Landau noted that the principal textual justification for federal justiciability analysis, the "case or controversy" limitation of Article III, simply does not apply to state courts. *Id.* at 1313–16. Landau noted that the Supreme Court of Oregon came to the conclusion that there is "nothing

in the wording of the [Oregon C]onstitution, its historical context, or the state's early decisional history" that supported adoption of federal justiciability doctrine. *Id.* at 1329 (citing *Couey v. Atkins*, 355 P.3d 866, 895 (Or. 2015) (en banc)). Landau noted that courts in Florida and Michigan came to similar conclusions. *Id.* at 1329–30 (discussing *Dep't of Revenue v. Kuhnlein*, 646 So. 2d 717, 720 (Fla. 1994); *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 693–96 (Mich. 2010)). While Justice Landau conceded that the cases in Oregon, Michigan, and Florida represented a minority view, he expressed the hope that these authorities would encourage state courts to "question the need for perpetuating the errors and incongruities of federal justiciability doctrine." *Id.* at 1330.

6. *Application of political question doctrine in Iowa.* There are a number of Iowa cases that consider potential application of the political question doctrine to state law questions. In *Des Moines Register & Tribune Co. v. Dwyer*, a newspaper and freedom of information organization claimed that the detailed call records of the state senate were public records and that state officials violated the open records law by declining to produce them. 542 N.W.2d 491, 493–94 (Iowa 1996) (en banc). The defendants claimed that the state senate had the constitutional authority to determine rules of proceedings and, as a result, the plaintiffs were not entitled to relief. *Id.* at 494.

The *Dwyer* court analyzed the question under political question and justiciability doctrine. *Id.* at 495–502. The *Dwyer* court considered whether there was a "textually demonstrable constitutional commitment to the senate [that] renders nonjusticiable the Senate's decision to keep specific detailed phone records confidential." *Id.* at 496, 501. The *Dwyer* court found such a textual commitment in Iowa Constitution article III,

section 9, which provided that each house has the power to "determine its rules of proceedings." *Id.* at 503. We cited a Mississippi case for the proposition that similar constitutional language was "about as broad and comprehensive as the English language contains." *Id.* at 498 (quoting *Witherspoon v. State ex rel. West*, 103 So. 134, 138 (Miss. 1925) (en banc)). According to the *Dwyer* court, the textual commitment of article III, section 9 prevented courts from compelling the legislature to act in accordance with its own rules "so long as constitutional questions are not implicated." *Id.* at 496 (citing *Abood v. League of Woman Voters*, 743 P.2d 333, 336 (Alaska 1987)).

Justice Harris, joined by two colleagues, dissented in *Dwyer. Id.* at 503–06 (Harris, J., dissenting). The dissent argued that the senate policy on phone detail did not amount to a "rule of proceeding" under article III, section 9. *Id.* at 505. The dissent rejected what it called the political question "escape route" to permit the legislature to avoid the open records law. *Id.*

The next case involving the political question doctrine is *Luse v. Wray*, which involved an election law case where only 24 votes separated two candidates for the house of representatives. 254 N.W.2d 324, 325 (Iowa 1977) (en banc). Of the ballots cast, 135 were absentee. *Id.* at 326. The absentee ballots, however, provided the margin of victory for the apparent winner. *Id.* But, the house of representatives determined that 43 of the 135 absentee ballots were illegally cast from nursing home or health care facility patients. *Id.* The improperly cast ballots were comingled with the other absentee ballots so the precise impact of the 43 improperly cast ballots on the election could not be determined. *Id.* Exercising its powers under Iowa Constitution article I, section 7, the house of representatives determined that under the circumstances, all 135

absentee ballots should not be counted, thereby swinging the election to the challenger. *Id.*

The disappointed candidate filed an action seeking a declaration that the house of representatives acted illegally in declaring his opponent the winner. *Id.* In considering the matter, we recognized that under article III, section 7, "each house shall . . . judge [] the qualifications, election . . . of its own members." *Id.* (quoting Iowa Const. art. III, § 7). Nonetheless, we emphasized that "Iowa courts have [the] power to adjudicate substantial claims of deprivation of federal or Iowa constitutional rights by the houses of the Iowa General Assembly in the exercise of the houses' election contest powers under [article III, section 7] of the Iowa Constitution." *Id.* at 328. In *Luse*, we concluded that the plaintiff raised a substantial constitutional question, namely, whether the statutory regulation of absentee balloting by residents of nursing home or health care facilities violated equal protection. *Id.* at 328–29. And with little discussion we determined that the question was justiciable. *Id.* at 329. We proceeded to consider the merits of the case, concluding that no equal protection problem was present. *Id.* at 331.

After *Luse*, we considered the political question doctrine in another election contest in *State ex rel. Turner v. Scott*, 269 N.W.2d 828, 828, 830 (Iowa 1978) (en banc). In *Scott*, the attorney general brought a quo warranto action seeking to remove a state senator from office. *Id.* at 829. According to the attorney general, John Scott did not meet the qualifications for state senator because he had not resided in the district for one year prior to his election. *Id.* The senate voted 25 to 24 to seat Scott. *Id.* We decided in *Scott* that the question of qualification of a state senator was nonjusticiable because it was exclusively vested in the senate. *Id.* at 831–33.

The *Scott* court's determination that the matter was nonjusticiable, however, was limited. *Id.* at 832. The *Scott* court emphasized that there was no allegation that the action violated constitutional rights. *Id.* "Absent a showing of deprivation of substantial constitutional rights, we will not review the action taken by the General Assembly under its Article III, [section] 7 authority." *Id.*

There are two other cases where this court discussed the contours of the political question doctrine. In *King v. State*, the plaintiffs challenged the provision of education in Iowa under several constitutional grounds. 818 N.W.2d 1, 5–9 (Iowa 2012). A majority determined that under the pleadings as alleged, the plaintiffs failed to state a claim for which relief may be granted. *Id.* at 21–22. In dicta, the majority canvassed aspects of Iowa cases and some federal cases involving political questions. *Id.* at 16–22. The essay did not mention the emphasis in *Dwyer*, *Luse*, and *Scott* that the political question doctrine did not apply if there were substantial allegations of violation of another constitutional provision. In the end, the majority emphasized that "we need not decide today whether plaintiffs' claims under the education clause present a nonjusticiable political question." *Id.* at 21.

The political question doctrine was also examined in a unanimous opinion in *Freeman v. Grain Processing Corp.*, 848 N.W.2d 58, 89–94 (Iowa 2014). In *Freeman*, the plaintiffs asserted that pollution from a local corn wet milling facility amounted to a common law nuisance, a statutory nuisance, trespass, and negligence. *Id.* at 63. The defendants claimed that the questions raised were political questions not amenable to resolution by the judiciary. *Id.* at 90.

Unlike in *King*, in *Freeman* the unanimous court ruled on the application of the political question doctrine. *Id.* at 94. We ruled that it

did not apply. *Id.* We noted that whether to apply the political question doctrine in state court had been an issue of some controversy, that some questioned the applicability of the political question doctrine in state courts, and that the political question doctrine had rarely provided the basis for a holding in our cases. *Id.* at 90–94. We emphasized that "[t]he holdings in *Dwyer* and *Scott* [were] consistent with the narrower classical model of the political question doctrine" that focused on the presence of a textually demonstrable constitutional provision, the first *Baker* factor, in making the determination. *Id.* at 92

Because no party urged us to depart from the federal model, however, we applied the *Baker* factors to the case. *Id.* at 92–94. We noted the lack of a textually demonstrable commitment of the questions in the case "cuts markedly against" application of the political question doctrine. *Id.* at 93. Moving on to the second *Baker* factor, we concluded that there were judicially manageable standards in the large body of tort law. *Id.* at 93–94. Similarly, we found that there was no need for an initial policy determination by the legislative branch because the body of tort law established a baseline for judicial review. *Id.* at 94. Finally, we noted that complexity alone did not establish a political question. *Id.* (citing *Connecticut v. Am. Elec. Power Co.*, 582 F.3d 309, 326, 331 (2d Cir. 2009); *Alperin v. Vatican Bank*, 410 F.3d 532, 552 (9th Cir. 2005)).

**C. Nonjusticiability.** The notion of nonjusticiability generally overlaps with the political question doctrine, but it may to some extent extend beyond it. A question is said to be nonjusticiable because there are no judicially manageable standards to permit a court to decide it in a principled fashion. *See Baker*, 369 U.S. at 198, 217, 82 S. Ct. at 700, 710. Under *Baker*, nonjusticiability is one of the factors to consider in determining the presence of a political question. *Id.* at 217, 82 S. Ct. 710.

Nonjusticiability is a term that has been applied by the United States Supreme Court with respect to the question of gerrymandering. *Rucho*, ___ U.S. at ___, 139 S. Ct. at 2491. Questions in foreign affairs are sometimes said to be nonjusticiable. For instance, what standards would a court use to determine the legality of a war? *See Darnall v. Day*, 240 Iowa 665, 669, 37 N.W.2d 277, 279 (1949); Chris Smith, Note, *Litigating War: The Justiciability of Executive War Power*, 14 Duke J. Const. L. & Pub. Pol'y Sidebar 179, 186–87 (2019). The notion of nonjusticiability is not a concept well developed in Iowa court cases.

**D. Application of Political Question and Nonjusticiability Doctrines to This Case.**

1. *Political question doctrine.* The best approach to the political question doctrine and the approach that is most consistent with our cases is the classical approach. In other words, in order for the political question doctrine to apply, there must be a textual commitment of a specific question to one of the political branches of government. That is the approach of *Dwyer*, *Luse*, and *Scott*.

The political question doctrine is not and should not be a discretionary doctrine to be utilized when the politics of a case are apparent or where the court is otherwise uncomfortable with deciding a case. Courts are designed to rule on all cases brought by all comers, not to selectively exercise their jurisdiction according to judicial taste. The court sits precisely to decide controversial questions. Questions that are not controversial generally do not require judicial resolution. Further, a prudential application opens this court to the charge of playing politics by avoiding exercise of judicial responsibility.

Applying the classical model, there is no textual commitment of the specific question in this case, namely, assigning the responsibility to

decide whether the Governor has made a timely appointment. As noted by Wright, Miller, and Cooper, and supported by *Powell*, "denial of judicial power to decide one question does not entail denial of power to decide closely related questions." 13C Wright, Miller & Cooper § 3534, at 669.

Instead, under *Baker*, the proposition must be "textually demonstrable," not something implied or inferred. *Baker*, 369 U.S. at 217, 82 S. Ct. at 710. The text must "unquestionably commit" the specific question posed to another branch of government. *Goldwater*, 444 U.S. at 999, 1000 S. Ct. at 534–35 (Powell, J., concurring). You need to point to the provision vesting a specific power in another branch and declare, with apologies to Herman Melville, "Aha, there she blows!" in order to have a textually demonstrable commitment of the specific question at issue.

The case is clearly distinguishable from *Scott*. In *Scott*, we considered a challenge to the qualifications of a state senator. 269 N.W.2d at 828–29. Article III, section 7 of the Iowa Constitution expressly vests each house with the power to judge the qualifications of its own members. Given the textually demonstrable commitment on the question of who determines whether a person is qualified, we declined to intervene on the ground that the power was committed to another branch of government. *Id.* at 831–33.

Here, the constitutional provision in a textually demonstrable fashion vests power in the Governor to choose an appointee from among those nominated for a judgeship. But it does not provide a textually demonstrable power to determine whether the thirty-day time limit has been met with any branch of government. That presents a question for judicial resolution.

Indeed, the case is very similar to *Marbury*. In *Marbury*, the question was whether the President had validly appointed a judge. 5 U.S.

(1 Cranch) at 137, 154–55. Chief Justice Marshall did not consider the case as raising a "political question." Whether the President had validly appointed Marbury was a question for judicial resolution. The same applies here.

There can be no question that the discretionary choice by the Governor of whom to appoint is a power textually committed to her and is beyond judicial review. And, if the chief justice has made an appointment, that discretionary choice also would not be subject to judicial review. The choice is demonstrably assigned to the Governor in the first instance and, later, the chief justice. But there is absolutely nothing in the text of the constitution that vests authority in the Governor or the chief justice to determine whether an appointment by the Governor was timely made under article V, section 15. The question of what is timely under the constitutional provision is a question without a textually demonstrable commitment to another branch of government. It is a conventional interpretive question for the courts. It is what we do. We should decide it just as the United States Supreme Court decided the question in *Marbury* and just as the Supreme Judicial Court of Massachusetts decided the question of the validity of a judicial appointment in *McCarthy*.

2. *Nonjusticiability.* Further, it simply cannot be said that the question of whether the appointment was timely made was unmanageable or beyond judicially discoverable and manageable standards like, say, reapportionment questions. The question of whether an appointment has been made in a timely fashion is not imponderable nor does it involve a cosmic question of the order of the political universe. It has nothing of the supposed complexity of a partisan gerrymander case, a type of case that has so divided the United States Supreme Court. It is quite mundane. Does anyone really think that the question of the timeliness of an

appointment by an executive is beyond judicially discoverable and manageable standards? After fourteen years on this court, I would give this case no more than a 2 or 3 on a 10-point scale in terms of difficulty or complexity. This is clearly not the kind of question that is "outside the courts' competence and therefore beyond the courts' jurisdiction." *Rucho*, ___ U.S. at ___, 139 S. Ct. at 2494. It is hard to see how the interpretation of the timeliness provision of article V, section 15 of the Iowa Constitution is a nonlegal question beyond the ability of the judiciary to resolve.

### III. Conclusion.

Our court is not a first responder. As a result, I would not attempt to resolve the question without further proceedings before the district court. I would reverse and remand the matter for further proceedings.